THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* HYMAN M. EPSTEIN, Appellant.

Crimes — larceny — trial — evidence — charge — charge of grand larceny by appropriation of property in possession of defendant belonging to another — defense that defendant had purchased property and paid for same by several checks — erroneous exclusion of bank statement showing withdrawals from defendant's account of amounts of checks — erroneous contention that if defendant made unauthorized sale he became trustee of proceeds within meaning of section 1290 of Penal Law — the word " trustee " in statute means actually appointed "trustee" not trustee ex maleficio or in invitum — erroneous charge and refusal to charge — when errors may not be disregarded.

1. Upon trial of an indictment charging defendant with the crime of grand larceny, in that, having in his possession certain property of complainant, he feloniously appropriated the same to his own use, where complainant has testified that she never authorized defendant to sell certain securities and defendant has testified that she sold them to him and he paid for them with five several checks, which he could not produce because they had been taken from his office after payment and cancellation, it was error for the trial court to refuse to receive in evidence a statement of his account, copied from the books of his bank of deposit, showing withdrawals as stated by defendant in his testimony but not the names of the payees of the several checks, on the ground that the statement was " a self-serving declaration." The statement was neither " self serving " nor inadmissible as irrelevant and immaterial, under the only objections taken. If competent, as admitted, it was relevant and material as tending to corroborate defendant's testimony.

2. The charge of the indictment was that defendant appropriated to his own use a sum of money received from the sale of stock, but, from testimony of complainant it would seem that defendant's crime consisted of a wrongful conversion of a certificate of stock by an unauthorized sale thereof, while, on the other hand, defendant's testimony, if true, showed a lawful sale and that his crime consisted in appropriating the proceeds. A contention that in either case the crime charged was made out, for that if defendant made an unauthorized sale of the certificate he became a trustee of the moneys received,

within the meaning of section 1290 of the Penal Law, which provides that a trustee who, with felonious intent, appropriates to his own use trust property in his possession is guilty of larceny, cannot be sustained. The Legislature, in using the word " trustee " in the section quoted, meant none other than a person in whom a trust or confidence had voluntarily been imposed and by whom it had voluntarily been accepted. It did not intend thereby a person who might be declared by a court of equity to be a trustee *ex maleficio* or *in invitum*. The section should not be so construed that a thief may be found guilty not only of theft of property stolen but also of theft of the proceeds of the same property.

3. A charge of the trial court, therefore, that if defendant received money on a sale of the stock certificate, he held it as trustee for complainant, to whom it belonged, and a refusal to charge that if defendant stole the securities he must be acquitted, constitute error.

4. The errors may not be disregarded. The excluded bank statement was an important item of proof in defendant's favor and the instructions of the trial judge completely eliminated from the case the defense that though defendant may have been guilty of misappropriating a certificate of stock, he was not guilty, as charged, of the crime of stealing the proceeds thereof.

*People* v. *Epstein*, 218 App. Div. 764, reversed.

(Argued May 5, 1927; decided May 31, 1927.)

APPEAL, by permission, from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered November 26, 1926, which affirmed a judgment of the Court of General Sessions of the county of New York, rendered upon a verdict convicting the defendant of the crime of grand larceny in the first degree.

*Otho S. Bowling* and *Robert H. Elder* for appellant. The charge was that defendant stole money, whereas the evidence showed that defendant stole (if anything) certificates of stock. This variance was fatal. (*People* v. *Geyer*, 196 N. Y. 364; *People ex rel. Briggs* v. *Hanley*, 226 N. Y. 453; *People* v. *Dimick*, 107 N. Y. 13; *People* v. *Lammerts*, 164 N. Y. 137; *Silsbury* v. *McCoon*, 3 N. Y. 379; *Kittredge* v. *Grannis*, 244 N. Y. 182; *Commonwealth*

v. *Hays*, 14 Gray [80 Mass.], 62; *Rolfe* v. *Gregory*, 4 De
Gex, J. & S. 576; 3 Pom. Eq. Juris. [3d ed.] § 1044;
*Murray* v. *Lyburn*, 2 Johns. Ch. 441.)

*Joab H. Banton, District Attorney (William B. Moore
cf counsel), for respondent.* The People's case that the
defendant was guilty of larceny as agent, bailee and
trustee of a certain sum of money was fully proved by
the evidence. There was no variance between the allega-
tions in the indictment and the proof at the trial. (*People*
v. *Cruger*, 102 N. Y. 510; *People* v. *Geyer*, 196 N. Y.
364; *People* v. *McDonald*, 43 N. Y. 61; *People* v. *City
Bank of Rochester*, 96 N. Y. 32; *Hammond* v. *Pennock*,
61 N. Y. 145; *Densmore* v. *Searle*, 7 App. Div. 45.)

KELLOGG, J. The indictment, in two counts, charged
the defendant with the commission of the crime of grand
larceny in the first degree. The first count charged that
the defendant, on the 4th day of April, 1924, did steal,
take and carry away from one Ray Dona Kuba the sum of
$2,731 in lawful money. The second count charged that
the defendant, having in his possession the property of
Ray Dona Kuba, described in the first count, as agent,
bailee and trustee thereof, did feloniously appropriate
the same to his own use. On the trial, the judge presiding
withdrew from the consideration of the jury the charge
contained in the first count. The jury found the defend-
ant guilty of the crime of grand larceny as charged in the
second count. The judgment of conviction was affirmed,
and from the judgment of affirmance the defendant
appeals.

Witnesses for the prosecution gave testimony of which
the following is a brief summary: The complainant, Ray
Dona Kuba, for ten years prior to the year 1918, had been
the mistress of one Moses Sahlein. She left him in the
year 1918 and Sahlein then promised that he would
take care of her for the rest of her life. In August of the

year 1923 Ray Kuba met Sahlein and urged him to give her the money he had promised. In pursuance of the request, on August 17, 1923, Sahlein gave Ray Kuba certain securities, among which were 400 shares of the common stock of the Texas and Pacific Railway Company, and a $5,000 bond of the Missouri, Kansas and Texas railroad. Sahlein died within a few weeks. Ray Kuba consulted with her brother, Dubie Kuba, concerning the disposal of the securities given her. He, in turn, consulted with his business associate, the defendant, Hyman M. Epstein. The two visited a broker for the purpose of procuring the securities to be sold. The broker, when told that the securities came from the possession of Sahlein, then deceased, declined to handle the securities, on the ground that he might get into trouble with Sahlein's estate. Early in October, 1923, Ray Kuba, Dubie Kuba and Epstein met in the Commodore Hotel in New York. Ray Kuba had with her the securities given her. Epstein reported that the securities could not be sold. He suggested interviewing the attorney for the Sahlein estate, and stated that he thought he could get $100,000 for the securities. That sum was about five times their market value. Epstein said that he must have the securities to introduce himself to the attorney. Ray Kuba thereupon turned over to him the securities, and Epstein said that he would place them in a vault for safekeeping. Epstein saw Mr. Flaherty, the attorney for the Sahlein estate. He tried to get from him an authorization of the estate for the sale of the securities, but was not successful. Epstein reported back to Ray Kuba that Flaherty would write Mrs. Stern, a sister of Moses Sahlein, to whom all his property had been left. He told her that some other woman, who had had relations with Sahlein, had obtained $1,000,000 from the estate. About the time Epstein went to see Flaherty Ray Kuba gave him a written statement setting forth her history and other interesting items. She stated therein that

Moses Sahlein left an estate of about $15,000,000 and specified various parcels of New York real estate which he owned. The statement contained the following: "Attorney Flagherty is bluffing as M. S. only lunched with him once or twice a year;" " I think Flagherty cannot be bluffed or made to do as Mrs. Rose Stern (M. S. only sister). If Mrs. Stern is seen and told the story (omitting my name Ross) she will consent as she would not like to have the N. Y. and Frisco papers get the story of M. S. life which involves affairs with among others the following " (naming them); " Tell Mrs. Stern you have enough leads for the newspapers to make a big story of it; " " M. S. Cousin Grace Sahlein and her daughter-in-law, Mrs. Grace Steinau, would make a big hit of notoriety and Mrs. Stern knows all about it. Letters from the younger Grace whom M. S. tempted with big money and then thru aside would be made public. The above would involve the Sahlein old maids and the papers can get the entire life, and signed statement of many." On October 17, 1923, Epstein procured the 400 shares of Texas and Pacific stock to be transferred to his name on the books of the corporation. The certificates had been originally issued to Shafer Bros., brokers, and were indorsed in blank by them. Before procuring their transfer to himself Epstein filled in the blank assignments on the back thereof with his name as assignee. On the same day as the transfer, October 17th, Epstein turned in the old certificates and procured new certificates to be issued to himself. On the 14th of January, 1924, Epstein delivered one of the certificates to a broker for sale. It was sold and the proceeds were credited to his account with the broker. On February 4th, 1924, he delivered the remaining three certificates to the broker for sale. One was sold on the same day and one on March 7th. The proceeds were placed to his account and checks were drawn by the broker payable to Epstein, which he cashed. On April 4th, 1924, the fourth certificate was sold for

$2,731.    This is the certificate for converting the proceeds of which Epstein was charged with grand larceny.    The broker drew a check for $2,800, payable to Epstein, on the same day, and the check was returned subsequently to the broker as paid.    It then bore the indorsement of Epstein.    Meanwhile, Ray Kuba kept importuning Epstein for a settlement with the Sahlein estate, and Epstein kept putting her off.    Finally, in May, 1925, Ray Kuba and her sister met Epstein in his apartment, Ray Kuba told him she could not wait any longer; that she was going to Max Steuer, a well-known lawyer, with her case.    She demanded her securities.    Epstein asked for another week.    He said she could raise money on the Chemical Bank stock, one of the securities given her by Sahlein, and he turned over to her the stock certificate therefor.    The blank assignment on the back thereof had been filled in with the name of Epstein as assignee.    In October, 1925, Ray Kuba, with her attorney, went to Epstein's apartment and demanded her securities.    He said: " I haven't got them; I have given you the money." Ray Kuba never received the proceeds of the 400 shares of Texas and Pacific stock, nor the $5,000 Missouri, Kansas and Texas bond, which Epstein had caused to be sold for him on April 15th, 1924.

Ray Kuba testified that she never authorized the defendant Epstein to sell her securities.    The following is her testimony upon this point: " Q. Now, I understand you to say, and did you not say, that you gave no authority whatever at any time to this defendant to sell the certificates?    A. Yes.    Q. Is that correct?    A. Yes.    Q. You never told him to do it?    A. Never.    Q. Never asked him to do it?    A. No.    Q. He never told you he was going to sell those things?    A. No.    Q. You didn't want him to?    A. No.    Q. And when he did it, he did it contrary to your wishes and orders, is that right?    A. Yes."    The burden of her testimony and of her statement is that she employed Epstein, not to sell her securities to buyers generally, but

to extort large sums therefor from the estate of Moses Sahlein, upon threats otherwise to expose his past life through the public prints.

The defendant, Hyman M. Epstein, called as a witness, told a story which partly confirmed the testimony of the prosecution's witnesses, but which in important particulars differed from the testimony of Ray Kuba. He stated that he was employed generally to sell the securities for Ray Kuba. He denied that there was a plan made to extort more money than the securities were worth from the Sahlein estate. He said that Ray Kuba complained often that he had not sold the securities; that she importuned him to get money for them; that he told her the difficulties standing in the way of sales unless the Sahlein estate authorized them; that finally, in the latter part of September, 1923, he offered to buy the 400 shares of Texas and Pacific and the $5,000 bond of Missouri, Kansas and Texas for two-thirds their market value. He said that the market value of these particular securities amounted to $9,800; that he offered to give her $6,500 for them; that she said she would take $6,550; that the bargain for their sale at that price was then made. He said that he gave her a check for $900 at the time; that he gave her a check for $500 within two or three days; that within a week he gave her a check for $1,100; that in November he gave her a check for $2,150; that in the same month he made his final payment by giving her a check for $1,900. The complainant, Ray Kuba, denied that she ever sold the 400 shares of Texas and Pacific stock or the Missouri, Kansas and Texas bond to the defendant Epstein.

The defendant, Epstein, did not offer in evidence the checks, stated to have been given by him to Ray Kuba, which, if given and thereafter cashed, must have been returned to him. He testified that the canceled checks had been taken from the office which he had occupied with Dubie Kuba, and that he was unable to produce

them. In lieu thereof he offered for identification a statement of his account copied from the books of his bank of deposit. The district attorney stated: "I won't object to their competency, but as to their relevancy and materiality, I will object to them, because I don't know what his defense is, as I haven't heard any opening." The court said: "He is placing himself on record that he raises no objection as to whether they were correctly copied from the main sheet, or whether the transcript is true." The district attorney then stated: "That is right." Later the statement was offered in evidence. Again, the district attorney said: "I do not object to their competency or the fact that they were not proven by the bank." The court refused to receive the offered proof, declaring the statement to be "a self-serving declaration." We are at a loss to know wherein the statement was "self-serving" or inadmissible under the objections taken. If competent, as it was admitted to be, it certainly was relevant and material. The statement showed that the defendant Epstein on September 25th, 1923, checked out of his account $900, on October 26th, $1,100, on November 9th, $2,150, and on November 23d, $1,900. These withdrawals were made precisely as stated by Epstein in his testimony, and although the statement did not disclose the names of the payees of the several checks, nevertheless, it tended to corroborate the testimony so given. The court was clearly in error in excluding the statement.

The indictment did not charge the defendant Epstein with larceny in causing the certificate of stock for 100 shares of Texas and Pacific Railway stock to be sold for his account on April 4th, 1924. The charge was that he appropriated to his own use the sum of $2,731 received from the sale. Ray Kuba testified positively that she gave no authority to Epstein to sell the stock for her. Her testimony, coupled with her written statement,

16

tended strongly to establish that the securities owned by
her were turned over to Epstein for the sole purpose of
extorting from the estate of Moses Sahlein a sum far
greater than their value.   On the other hand, the defend-
ant Epstein testified that he was expressly authorized
to make a sale of the securities.   If Ray Kuba told the
truth it would seem to follow that Epstein's crime con-
sisted in a wrongful conversion to his own use of the
certificate of stock by a sale thereof on April 4th, 1924.
On the other hand, if Epstein told the truth, the sale was
lawfully made and his crime consisted in appropriating
the proceeds of the sale as charged in the indictment.
The district attorney urges that in either case the crime
charged was made out.   Section 1290 of the Penal Law
provides that a person is guilty of larceny who, with
felonious intent, " Having in his possession, custody, or
control, as a bailee, servant, attorney, agent, clerk,
trustee, or officer of any person, association, or corpora-
tion, or as a public officer, or as a person authorized by
agreement, or by competent authority, to hold or take
such possession, custody, or control, any money, property,
evidence of debt or contract, article of value of any nature,
or thing in action or possession, appropriates the same to
his own use, or that of any other person other than the
true owner or person entitled to the benefit thereof."
The district attorney argues that, even if the defendant
Epstein made an unauthorized sale of the certificate, he
became a trustee of the moneys received therefrom,
within the meaning of the section, and was properly
chargeable with a larceny thereof in appropriating the
same to his own use.   We do not agree with the con-
tention.   If Epstein made an unauthorized sale the legal
title to the moneys received therefrom passed to him.
(*Silsbury* v. *McCoon,* 3 N. Y. 379; *Matter of Cavin* v.
*Gleason,* 105 N. Y. 254, 261; *Vogt Mfg. & Coach Lace Co.*
v. *Ettinger,* 88 Hun, 83.)   It is true that a court of equity,
if resorted to, might have impressed a trust upon the

moneys received, and might have declared him a trustee thereof for the benefit of the true owner. (*Newton* v. *Porter,* 69 N. Y. 133; *Matter of Cavin* v. *Gleason,* 105 N. Y. 254, 260; *Holmes* v. *Gilman,* 138 N. Y. 369, 376; *Amer. Sugar Ref. Co.* v. *Fancher,* 145 N. Y. 552, 556; *Falk* v. *Hoffman,* 233 N. Y. 199.) However, the interposition of a court of equity, or at least the application of equitable principles, would have been necessary, in order that Ray Kuba might have had a recovery of the moneys. We think that the Legislature, in using the word "trustee" in the section quoted, meant none other than a person in whom a trust or confidence had voluntarily been imposed and by whom it had voluntarily been accepted; that it did not intend thereby a person who might be declared by a court of equity to be a trustee *ex maleficio* or a trustee *in invitum.* The section declares that a " bailee " who " appropriates " property in his possession " to his own use, or that of any other person other than the true owner " is guilty of larceny. Under that provision the defendant Epstein, if he sold securities belonging to Ray Kuba without authority and with felonious intent was guilty of a felony. If he appropriated to his own use the proceeds of the sale, then, under the district attorney's construction of the section, he was, as a " trustee " guilty of a second felony. We do not think that the section should receive such a construction that a thief who steals property might be found guilty not only of that theft, but also of the theft of stealing the proceeds of the property thus already stolen.

The court charged the jury in reference to the securities delivered by Ray Kuba to the defendant Epstein as follows: " They belonged to her, and if he got the money for them, that money belonged to her, and if he got $2,800 on that date, after having exchanged a certificate, the value of which was $2,731, that sum of money which he then got was hers, and it would be hers by reason of the fact that he held it only by being a trustee. He

could not destroy the relationship of bailee, agent, or trustee of that sum by converting the securities into its cash capital, or cash equivalent; that cash capital or cash equivalent was hers, and it could not be said to be the stealing of a piece of paper only and allow the man who stole the piece of paper, although he gets the money to say ' You can't accuse me of stealing the money — all you can accuse me of is stealing the piece of paper.' " The charge, as thus made, was duly excepted to.   Defendant's counsel requested the court to charge as follows: " I request your honor to charge the jury that if the defendant stole the Texas and Pacific securities on October 17th, 1923, he must be acquitted." The court said: " I refuse to charge other than what I have charged on that subject." In the view which we take of the case and have hitherto expressed, the charge and refusal to charge constituted error.

We do not feel that we may disregard the errors referred to. There was a fair question of fact as to whether or not the securities in question were purchased by the defendant from Ray Kuba and were his own property when he sold them. Upon that issue the bank statement which was excluded by the court was an important item of proof in the defendant's favor. There was a fair question of fact as to whether or not the defendant was authorized by Ray Kuba to sell the securities in question. The evidence that he was not so authorized was not greatly overbalanced, if at all, by evidence to the contrary. Consequently, it was a fair question of fact whether the defendant was guilty or not of the crime as charged. The instructions of the trial judge upon this question completely eliminated from the case a defense which the defendant had a right to urge, namely, that, although he may have been guilty of misappropriating a certificate of stock, he was not guilty, as charged, of the crime of stealing the proceeds of the certificate. Various other minor errors are complained of and were committed

by the trial judge, but it is unnecessary to refer to them. We think that the errors which we have detailed were such as to require a new trial.

The judgment of the Appellate Division and that of the Trial Term should be reversed and a new trial ordered.

Cardozo, Ch. J., Pound, Crane, Andrews, Lehman and O'Brien, JJ., concur.

Judgment reversed, etc.