## (June 21, 1979)

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MICHAEL A. YANNETT, Appellant.—Appeal from a judgment of the County Court of Broome County, rendered September 16, 1977, upon a verdict convicting defendant of the crime of grand larceny in the second degree. On November 24, 1976 defendant was charged in a nine count indictment containing seven counts of grand larceny in the second degree and two counts of grand larceny in the third degree. Defendant was acquitted of all but the seventh count. That count alleged that he withheld and appropriated to his own use approximately $26,248 of Medicare payments by failing to reimburse the money to his nursing home patients who had paid for their care at the Endicott Nursing Home (Home), which he owned and operated. The Home opened on June 12, 1972, but it had not then received Medicare certification by the Federal Government, which is one of the prerequisites for a nursing home patient to receive Medicare benefits. Where a patient enters a certified nursing home, there may also be a time lag between the date of the patient's entry and the date the Federal Government determines that the patient is eligible for Medicare benefits. Pending certification of a patient or the Home, payments to the Home for patients otherwise eligible for Medicare came from either the patients' private funds or, if they were eligible, from the Department of Social Services through Medicaid. The Home was not obligated to charge patients during this period according to the rate fixed by the Government; rather, it charged its patients according to its private patient rate of $32 per day which was $7 higher than the Medicare rate of $25 per day ultimately assigned to the Home by the Federal Government. Some six and one-half months after it opened, the Home received Medicare certification on December 22, 1972, and it received its first Medicare payments in March of 1973 which were retroactive to the date of an eligible patient's admission into the Home. Each month following March of 1973, the Home received increasing amounts of Medicare payments on behalf of patients who were in the Home as early as June of 1972. Thus, the Home had now received double payments for some patients, either from Medicaid and Medicare, or from private funds and Medicare. However, Federal law required the Home to reimburse those "moneys incorrectly collected" to the persons who had paid for the care of patients eventually found eligible for Medicare, here, Medicaid or private persons (see US Code, tit 42, § 1395cc). Medicare provides an eligible patient with 100 days of coverage at a nursing home. It pays the entire amount of the per diem rate for the first 20 days, and for the last 80 days, it pays a home the per diem rate less a coinsurance charge which the patient must pay directly to the nursing home. Thus, a Medicare patient is entitled to a refund from a nursing home of all the money he paid for the first 20 days, and all that he paid for the last 80 days less the coinsurance charge. Where a nursing home

receives certification after it has admitted patients who become eligible for Medicare, and when the patient is found eligible for Medicare benefits, the home must retroactively bill Medicare for the services it provided the patient during the hiatus between the patient's admission and the date that Medicare notified the facility that it would cover the patient. This is so even though payments on behalf of eligible patients had already been received from private patients or Medicaid. Under Medicare regulations and the terms of the nursing home's Medicare provider agreement, the nursing home must then give a refund to the private Medicare patient because the patient has already paid the home for the care he received during the period retroactively covered by Medicare (see 42 CFR 405.618, 405.620, 405.621). An audit of the Home's records revealed that 31 patients whose stays were covered by Medicare did not receive from the Home proper refunds of money that they had paid to the Home before Medicare provided benefits for them, and that the total amount of the moneys was $20,474.65. The indictment did not charge defendant with wrongfully obtaining the money from more than one source; as noted, Federal regulations contemplated such a double payment (see 42 CFR 405.618). Rather, the essence of the charges was that defendant failed to correctly refund on time the Medicare payments to the private patients and the Departments of Social Services (Medicaid). Defendant was acquitted of eight of the nine counts charging him with embezzlement by withholding payment of these refunds to Medicaid, but he was convicted of Count No. 7, which charged that from on or about March of 1973 to January of 1975, defendant withheld and appropriated to his own use approximately $26,248 of Medicare payments by failing to reimburse that money to 31 private patients at the Home who had paid for their care. Subdivision 1 of section 155.05 of the Penal Law provides that "A person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself * * * he wrongfully takes, obtains or withholds such property from an owner thereof", and subdivision 2 thereof defines larceny to include "embezzlement". Defendant first contends that the prosecution failed to prove that he possessed the requisite intent necessary to sustain a larceny conviction. Harry Elliott, defendant's nursing home administrator, testified that in June of 1973, three months after the Home began to receive Medicare reimbursement money, he explained to defendant the proper method of refunding Medicare payments, and showed him a Medicare handbook which set out the method to calculate refunds due to patients. He explained to defendant that he had refunded to a Mrs. Warner, whose mother was a patient in the Home for 20 days, all the money she had paid to the Home in advance of the Medicare benefits the Home subsequently received for her mother. Elliott told defendant that Medicare pays for all covered services which a patient receives during the first 20 days of nursing home care, and that for the last 80 days, Medicare pays everything less the per diem coinsurance charge. Elliott testified that defendant then became furious, stating that the Government had no right to "dictate" to him how to run his nursing home, and accordingly, ordered Elliott to refund to the patients no more than the amount which Medicare had paid to the nursing home on their behalf. In 1972, Medicare reimbursed the Home at $25 per day, which was $7 less than the rate of $32 per day the Home charged patients who were not eligible for Medicare benefits. Consequently, Elliott withheld from Medicare patients an amount equal to the difference between the Medicare rate and the private patient rate, which, however, violated Medicare regulations prohibiting a nursing home from charging its patients other than the

coinsurance charge. Elliott also testified that defendant told him that he would not pay any refund unless Elliott calculated the refunds on separate sheets of paper, which he would have to give to defendant before he signed any refund checks. Elliott further testified that he initially complied with defendant's directive, to avoid incurring his "wrath". Later, however, he surreptitiously credited the accounts of some private Medicare patients entitled to refunds. When defendant discovered this, he ordered Elliott to refrain from further crediting any patient's account and again instructed him to disregard Medicare regulations. There was also testimony that in connection with the refund due to the estate of a former patient of the Home, Elliott showed defendant a copy of a letter from an employee of the local Medicare office which indicated the proper method for calculating the refund due to the estate. Additional testimony disclosed that an irate patient's family threatened to go to the "Help" column of a local newspaper because defendant had sent an inadequate refund check, which was only for the amount Medicare had paid to the nursing home. Elliott testified that defendant stated "that no one should try to influence him by threatening that they were going to take him to the Help column to force a check to be made". Shortly thereafter, however, an additional check was sent to the family. Defendant argues that Elliott's testimony revealed that he did not understand the Medicare reimbursement procedure, and that his explanation to defendant was misleading and led to a misunderstanding by defendant of the reimbursement procedure. Defendant asserts that he was led to believe that his nursing home would not be paid by anyone—Medicare or the patients—for the first 20 days of the patient's stay at the Home. He also points out that the refund procedure was complex; that Elliott made numerous mistakes in calculating refunds; and that he never told Elliott not to make refunds. Finally, he points out that the prosecutor's office too made numerous errors of calculation in its original bill of particulars. In our view, however, these points did not establish that defendant did not intend to steal from his patients. Rather, they raised credibility questions which were for the jury's resolution (*People v Mason,* 55 AD2d 726; *People v Mac-Donald,* 53 AD2d 980; *People v De Groat,* 5 AD2d 927), and we, therefore, conclude that there was sufficient evidence from which the jury could properly infer that defendant intended to steal. Defendant next contends that the Trial Judge erred in charging the jury that as a matter of law the private patients or their families owned the money stolen by defendant. He argues that the private patients did not own the Medicare reimbursement money and that under subdivision 1 of section 155.05 of the Penal Law, which provides that a person commits larceny when, with the requisite intent, he "wrongfully takes, obtains or withholds such property from an owner thereof", his larceny conviction cannot stand. Pursuant to the Home's Medicare provider agreement, which Elliott signed at the direction of defendant in defendant's presence, the Home promised that it would "return any monies incorrectly collected from [Medicare patients] or to make such other disposition as may be specified in regulations." As noted, Federal regulations promulgated pursuant to title 42 (§ 1395cc, subd [a], par [1], cl [C]) of the United States Code require that "a provider must make adequate provision for the return (or other dispositon) of any moneys incorrectly collected from an individual [inpatient] or any other person on his behalf" (42 CFR 405.618). Section 405.621 declares that such "moneys incorrectly collected" must be refunded as "promptly as possible" and if a home cannot make a refund within 60 days, "an amount of money equal to the amount incorrectly collected must be set aside as described in § 405.620 (c)", which

in turn requires that the Home hold the money for the patients in accounts which the Home must establish in the name of each of them until final disposition. Under the regulations, therefore, defendant was imposed with a duty to hold for his private Medicare patients the money which they were entitled to receive as refunds. Thus, defendant's contention that the Home had the right to use the Medicare payments in the operation of the Home is without merit. The regulations specifically require otherwise. Moreover, defendant's position that the obligation to refund does not give rise to a patient's ownership in interest in the Medicare payments is untenable. Subdivision 5 of section 155.00 of the Penal Law defines an "owner" as "any person who has a right to possession thereof superior to that of the taker, obtainer or withholder." Under the statute (US Code, tit 42, § 1395cc), the regulations discussed above, and the Home's Medicare provider agreement, the patient clearly had a superior right to the Medicare funds than defendant, which was not altered by the mere fact that the payments were sent to the Home in the first instance. Defendant further contends that the requisite fiduciary relationship did not exist between himself and the private patients or their families. Larceny by embezzlement consists of the fraudulent conversion of property belonging to another by a person to whom that property has been entrusted *(People v Robinson,* 284 NY 75) and entails the breaching of a fiduciary relationship existing between the thief and his victim *(People v Wrieden,* 299 NY 425, 428). As explained by the Court of Appeals in *Matter of Gordon v Bailystoker Center & Bikur Cholim* (45 NY2d 692, 698), a "fiduciary relationship" arises from "the nursing home's assumption of complete control, care and responsibility of and for its resident." Although larceny by embezzlement will not lie for breach of a constructive trust *(People v Epstein,* 245 NY 234), we agree with the prosecution that the elements of an express trust existed in the instant case. The funds were sufficiently identifiable; the existence of a clearly designated beneficiary was present; there was a designated trustee; and under the Penal Law, the patients owned the funds since, as noted, they had the superior right to them. Finally, we reject defendant's contention that the prosecution failed to prove the time when the failure to properly refund would impose criminal liability. Federal regulations require prompt refunds (42 CFR 405.620) and subdivision 3 of section 155.00 of the Penal Law provides that to " 'deprive' " another of property means to withhold it from him permanently or for so extended a period or under such circumstances that the major portion of its economic value or benefit is lost to him. The testimony revealed that defendant withheld money belonging to his patients throughout 1973 and 1974, and that restitution was not made until after his conviction in 1977. Under these circumstances, the jury could properly find that defendant committed larceny by embezzlement by wrongfully withholding moneys belonging to his patients and their families. Judgment affirmed. Mahoney, P. J., Main, Mikoll and Herlihy, JJ., concur; Greenblott, J., not taking part.