THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v
CHARLES L. LYON, Respondent. (And 11 Other Ac-
tions.)

Second Department, August 31, 1981

APPEARANCES OF COUNSEL

*Robert Abrams, Attorney-General (Elliott S. Greenspan, Moses Weintraub* and *William F. Dowling* of counsel), for appellant.

*Pascarella, Dehler, Illmensee & Carra (Charles T. Theofan* and *Lawrence V. Carra* of counsel), for respondents.

## OPINION OF THE COURT

GULOTTA, J.

█ This case poses the question, *inter alia*, of whether a larceny indictment will lie against the named defendants for their alleged failure to remit sales taxes and/or employees' personal withholding taxes collected by them on behalf of the State of New York. We answer this question in the affirmative, and therefore reverse so much of the order of Criminal Term as granted, in part, the defendants' motions to dismiss.

On or about June 20, 1980, 12 indictments were returned against defendant-respondent Charles L. Lyon, individually and as a codefendant with 11 closely held corporations (the corporate defendants) of which he is an officer. Lyons, a Suffolk County entrepreneur, had apparently come under investigation for various tax offenses arising out of his multifaceted business operations, and the State Department of Taxation and Finance had apparently compiled sufficient evidence against the several codefendants to warrant presentation of the case before a Grand Jury. After hearing the evidence (which included Lyons' testimony) the Suffolk County Grand Jury returned indictments against the various codefendants for (1) larceny (founded upon the defendants' intentional failure to pay over sales and withholding tax revenues belonging to the State), (2) the failure to file corporate franchise tax reports, and (3) the evasion of personal income taxes. On the defendants' motions to dismiss, Criminal Term dismissed each of the counts against the individual defendant on the ground that his voluntary appearance before the Grand Jury pursuant to a knowingly executed waiver of immunity rendered him immune from prosecution since "the transcript unequivocally shows that the waiver [of immunity] was not in fact

sworn to before the Grand Jury, as is required by statute", while the remaining larceny counts were dismissed on the ground that the State was not the "owner" of the tax moneys collected by the corporate defendants, as the term "owner" is defined in article 155 of the Penal Law. However, so much of the remaining indictments as charged the corporate defendants with one count each of failing to file a New York State corporation franchise tax report were sustained by the motion court and were consolidated for purposes of trial. The People appeal from so much of this order as granted, in part, the respective motions to dismiss.

Defendants were indicted for varying degrees of larceny on the theory that they had collected withholding and sales tax revenues *as trustees* for the State of New York, and that their subsequent failure to remit said revenues constituted a theft of property within the meaning of section 155.05 of the Penal Law. This statute provides, in pertinent part:

"1. A person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof.

"2. Larceny includes a wrongful taking, obtaining or withholding of another's property, with the intent prescribed in subdivision one of this section, committed in any of the following ways:

"(a) By conduct heretofore defined or known as common law larceny by trespassory taking, common law larceny by trick, embezzlement, or obtaining property by false pretenses".

The term "owner" is defined in subdivision 5 of section 155.00 of the Penal Law as: "any person who has a right to [the] possession [of property] superior to that of the taker, obtainer or withholder [thereof]". Clearly, the State can qualify as an "owner" of property, as subdivision 7 of section 10.00 of the Penal Law includes the "government" within its definition of "person". However, while the State may qualify as an "owner" of property in the general sense,

the question to be determined is whether the defendants herein were *trustees* of the State for present purposes and whether the State was the *owner* of the sales and withholding tax revenues which had been collected by them, for while a trustee who withholds money held in trust commits a larceny by embezzlement (see *People v Yannett*, 49 NY2d 296; see, also, *People v Chesler*, 50 NY2d 203, affg 71 AD2d 792; *People v Robinson*, 284 NY 75), a mere debtor, who occupies no such relationship to his creditor, does not. Accordingly, if the only relationship which existed in the instant case was that of "debtor and creditor" or, for that matter, "constructive trust", there could be no larceny indictment (see *People v Yannett, supra; People v Epstein*, 245 NY 234). The pertinent Tax Law provisions are instructive in this regard, as section 675 (dealing with an employer's liability for withholding taxes) states: "Every employer required to deduct and withhold tax under this article is hereby made liable for such tax. For purposes of assessment and collection, any amount required to be withheld and paid over to the tax commission, and any additions to tax, penalties and interest with respect thereto, shall be considered the tax of the employer. *Any amount of tax actually deducted and withheld under this article shall be held to be a special fund in trust for the tax commission.* No employee shall have any right of action against his employer in respect to any moneys deducted and withheld from his wages and paid over to the tax commission in compliance or in intended compliance with this article." (Emphasis supplied.) Similarly, section 1132 (dealing with the collection of sales taxes) provides, *inter alia:* "(a) Every person required to collect the tax shall collect the tax from the customer when collecting the price, amusement charge or rent to which it applies. If the customer is given any sales slip, invoice, receipt or other statement or memorandum of the price, amusement charge or rent paid or payable, the tax shall be stated, charged and shown separately on the first of such documents given to him. *The tax shall be paid to the person required to collect it as trustee for and on account of the state.*" (Emphasis supplied.)

Importantly for present purposes, these are not the only

two instances in which a statute speaks of the creation of a "trust". Thus, article 3-A of the Lien Law establishes a trust fund over moneys received by an owner, contractor, or subcontractor in connection with the improvement of real property, while subdivision 1 of section 7-103 of the General Obligations Law (formerly Real Property Law, § 233), states that money deposited as security for the rental of real property "shall continue to be the money of the person making such deposit or advance and shall be held *in trust* by the person with whom such deposit or advance shall be made and shall not be mingled with the personal moneys or become an asset of the person receiving the same" (see, also, 22 NYCRR 603.7[d][1]; 603.15; 691.20 [d][1]; 1022.5). Notably, section 7-103 has been held to transform the debtor-creditor relationship between a landlord and tenant with regard to a security deposit into a trust relationship by operation of law (see *Mallory Assoc. v Barving Realty Co.*, 300 NY 297, mot for rearg den 300 NY 680; *People v Klinger*, 165 Misc 2d 634), and the unlawful retention of such money has been held sufficient to sustain an indictment for larceny (see *People v Klinger*, *supra*; cf. Lien Law, § 79-a). There is, however, little case law defining the precise nature of the statutory relationship spelled out in sections 675 and 1132 of the Tax Law.

In *Canale v New York State Dept. of Taxation & Fin.* (84 Misc 2d 786), the plaintiff, the receiver of an inn during the pendency of a mortgage foreclosure action, sought to obtain a refund from the State Department of Taxation and Finance upon surrender of the inn's liquor license, but the State refused on the ground, *inter alia*, that since the inn still owed sales and franchise taxes to the State, the latter, by virtue of such indebtedness, had the undoubted right to offset the amount of that refund against the taxes which were owing to it. The Court of Claims ultimately agreed with the State, stating (pp 789-790): "The court notes that sales taxes are collected by a vendor or retailer *as a trustee* (Tax Law, § 1132, subd [a]), and as such, the moneys so collected do not become the vendor's property, but rather *belong to the State* as the legal beneficiary of the trust. Accordingly, by vitrue of the *trust character* of the sales tax aspect here, the State's right to setoff is ob-

viously superior to any rights of lienors and creditors."
(Emphasis supplied.) More recently, the Court of Appeals
has observed in another context that the right of the State
Tax Commission to assess a civil penalty against an em-
ployer for his "willful" failure to remit personal withhold-
ing taxes (see Tax Law, § 685, subd [g]) turns on whether
the failure to remit was "consciously and voluntarily done
with knowledge that as a result, *trust funds belonging to
the Government* [would] not be paid over", and that "[a]ny
money actually deducted [for such purposes] was required
to be held as a 'special fund in trust for the tax commis-
sion' ", citing section 675 of the Tax Law *(Matter of Levin
v Gallman,* 42 NY2d 32, 34; emphasis supplied; see, also,
*Matter of MacLean v State Tax Comm.,* 69 AD2d 951, affd
49 NY2d 920). Somewhat similarly, in *Matter of Ames
Volkswagen v State Tax Comm.* (47 NY2d 345, 351) the
court, in the course of sustaining the constitutionality of
so much of section 1137-A of the Tax Law as required the
prepayment of certain estimated sales taxes, had occasion
to state: "We cannot adopt appellants' theory that as an-
ticipatory vendors they may not be cast in liability since
they are mere potential vendors, and nothing more. *As to
their status as vendors in a tax collection capacity, we take
note of the trustee relationship with which appellants have
no quarrel.* On the question of their 'status' we can state
it no more clearly than did this court in *Matter of Grant
Co. v Joseph* (2 NY2d 196, 203, mot to amend remittitur
granted 2 NY2d 992, cert den 355 US 869) where the
court stated that '[t]here is no doubt that the sales tax
law imposes upon the vendor the obligation of a taxpayer
*in addition to that of a collecting trustee.*' " (Emphasis
supplied.) Thus, the language in each of these cases tends
to support the conclusion that sales and withholding tax
revenues are held *in trust* by their collectors on behalf of
the State. In fact, the Appellate Division, First Depart-
ment, effectively reached the same result in *People v Felber*
(264 App Div 181) regarding the status of sales tax rev-
enues collected for the City of New York (see, also, *People
v Valenza,* 108 Misc 2d 86).

In reaching the opposite conclusion, i.e., that the State

is merely a creditor for the sales and withholding tax revenues collected for it, the court herein noted that under section 674 of the Tax Law there is no requirement that an employer segregate the personal income taxes withheld from an employee's wages from other money unless *directed* to do so by the State Tax Commission. Section 1137 (subd [e], par [3]) of the Tax Law provides similarly with regard to the collection of sales taxes. It must be noted, however, that the prohibition against commingling is not a *sine qua non* of a trust (see *People v Valenza, supra;* see, also, Lien Law, § 75, subd 1).

Clearly, when a sale is made, both the vendor and the vendee know that the State, not the vendor, is imposing the sales tax. Pursuant to statute, the amount of the tax must be shown separately on the sales receipt (Tax Law, § 1132, subd [a]), and accurate records of all transactions are required to be maintained by the vendor (Tax Law, § 1135). In addition, the taxes must be reported and paid over to the government at specified intervals of time (Tax Law, §§ 1136, 1137). Similarly, a detailed scheme for the withholding and paying over of personal income taxes has been created by section 674 of the Tax Law, and no one could feign surprise at the proposition that the money collected pursuant to its provisions is the property of the State.

In construing section 675 and subdivision (a) of section 1132 of the Tax Law, it is perhaps profitable to note that analogously with section 675 of the Tax Law, section 7501 of title 26 of the United States Code provides, *inter alia,* that "the amount of [income] tax[es] * * * collected or withheld [on behalf of the Federal Government] shall be held to be a special fund in trust for the United States." *Kalb v United States* (505 F2d 506, cert den 421 US 979) is instructive in this regard, as the matter there in suit included a claim by a former corporate officer that he could not be held responsible for the failure to remit Federal withholding taxes after a bankruptcy petition has been filed. The officer asserted that under such circumstances remitting the taxes would constitute the impermissible payment of a pre-existing debt, but the Second Circuit disagreed, stating (p 509) : "[W]ithholding taxes are not sim-

ply a debt. They are part of the wages of the employee, held by the employer *in trust* for the government. 26 U.S.C. § 7501(a) (1970). In paying the taxes over to the government the employer merely surrenders that *which does not belong to him.* We know of no rule prohibiting such payments by a petitioner under Chapter XI." (Emphasis supplied.) Thus, *Kalb* also supports the conclusion that the government is more than a mere creditor of withholding tax revenues. ·

*People v Keeffe* (50 NY2d 149) is not to the contrary and is, in fact, supportive of the proposition that a larceny indictment will lie under the facts at bar. In *Keeffe,* the Court of Appeals addressed the question of whether an attorney who holds the proceeds of the settlement of a personal injury action in his special account may be convicted of larceny when he withdraws from that account a sum sufficient to reduce the remaining balance below the amount to which his predecessor attorney is entitled as his fee. The court therein reversed the defendant's larceny conviction, holding (p 153) that "the predecessor attorney did not * * * have 'property' in or ownership of the money held by the successor attorney," but merely a contractual claim against him.

In the *Keeffe* case, an intermediate order had been made by the Surrogate's Court upon the settlement of a wrongful death action, which order provided, *inter alia,* that " 'the administrator be permitted to withdraw and pay out the amount of $2,500 to Alfred L. D'Isernia, Esq. [said sum] representing the fee to which he is entitled as former attorney for the petitioner, and that said amount shall be charged against the balance of counsel fees due to the attorneys for the estate.' " *(People v Keeffe, supra,* p 154.) Subsequently, however, and prior to the date of the final decree, the account containing the proceeds of the tentative settlement was depleted by the defendant. On these facts, the Court of Appeals held that the predecessor attorney had merely obtained a contractual claim to the money, as the intermediate order did not allow him a charging lien. Thus, while noting that the court rules of both the First and Second Departments require that the proceeds from the settlement of a personal injury or wrongful death action

be deposited into a separate (i.e., "special") account (see, e.g., 22 NYCRR 603.7[d][1]; 691.20[d][1]), the court opined that these funds were to be held in trust on behalf of the client and not the predecessor attorney, who was alleged to have been the victim therein. The court concluded (p 159): "Many reasons can be articulated for not escalating the failure to meet a contractual obligation into a criminal offense. Not the least of these is the question of when payment is due under an order such as that of the Surrogate's Court in this case which authorized but did not direct payment and included no specific provision with respect to the time of payment."

In direct contrast to the situation in *Keeffe (supra)*, section 675 and subdivision (a) of section 1132 of the Tax Law both provide that the tax money collected thereunder is to be held in trust *on behalf of the State*, i.e., the alleged victim herein. Moreover, the Tax Law provides a detailed scheme regarding the time and the manner of payment (see, e.g., Tax Law, §§ 674, 1135, 1136, 1137). In light of all of the foregoing, we conclude that a viable, statutory trust relationship has been created by the Tax Law, and that a larceny indictment will therefore lie to redress the alleged wrongful obtaining or withholding of personal income and sales tax revenues belonging to the State.

Contrary to the defendants' alternate contention, we do not believe that the so-called "criminal" provisions of the Tax Law operate to bar the instant prosecution, as subdivision (c) of section 695 specifically provides that "[a]ny individual [or] corporation * * * who willfully fails to collect or pay over any [personal income] withholding tax[es] * * * shall * * * be guilty of a misdemeanor" punishable by a fine of not more than $5,000 or imprisonment for not more than a year, or both, and that the foregoing is *"in addition to other penalties provided by law"* (emphasis supplied). Although it has been argued that this latter provision refers simply to the "civil" penalties found in other parts of the Tax Law (see, e.g., Tax Law, § 685), it should be noted that section 685 authorizes the State to seek civil penalties in the redress of certain failings punishable, as well, under *other* subdivisions of the criminal penalty provision, e.g., subdivision (a) of section 695 of the Tax Law, and that sub-

division (a) of section 695 does *not* provide that the remedy specified thereunder is "in addition to other penalties provided by law." "If the [foregoing] phrase is not necessary to establish that the State may pursue both civil and criminal penalties pursuant to sections within the Tax Law, then the inclusion of the phrase would most likely be an authorization for the State to pursue penalties outside the Tax Law. If not, then the words are mere surplusage." *(People v Valenza,* 108 Misc 2d 86, 89, *supra.)* In addition, since the theory of the prosecution's case is apparently larceny by embezzlement, "the conversion by the embezzler of property belonging to another which has been entrusted to the embezzler to hold on behalf of the owner" will be required to be shown *(People v Yannett,* 49 NY2d 296, 301, *supra).* Thus, the offenses as herein charged and a violation of section 695 of the Tax Law contain different elements (cf. *People v Chesler,* 71 AD2d 792, 794, *supra).* Moreover, a similar analysis can be employed with respect to subdivision (b) of section 1145 of the Tax Law (the statute punishing sales tax violations), as the statute proscribes, *inter alia,* the simple failure to file a return, the willful filing of a false return and the willful failure to collect the sales tax, and *no intent to defraud is required.* In addition, subdivision (b) of section 1145 similarly provides that the penalties imposed thereunder are "in addition to any other penalties herein or elsewhere prescribed" (see *People v Valenza, supra).* In *People v Eboli* (34 NY2d 281, 287), the Court of Appeals pertinently observed the following: "[W]e have consistently held that overlapping in criminal statutes, and the opportunity for prosecutorial choice they represent, is no bar to prosecution. Unless there is evidence of legislative intent to the contrary (see, e.g., *People* v. *Knatt,* 156 N. Y. 302), the existence of a specific statute prohibiting the conduct involved, does not prevent prosecution under a more general statute. *(People* v. *Bergerson,* 17 N Y 2d 398, 401; *People* v. *Hines,* 284 N. Y. 93, 105.) The same result follows even where the overlap is inherent in the definitions of two offenses." Accordingly, we have reached the conclusion that the provisions of the Tax Law imposing "criminal" sanctions upon these defendants do not bar the instant prosecutions.

█ Finally, we believe that Criminal Term erred in holding that the individual defendant inadvertently obtained immunity as a result of his testimony before the Grand Jury. CPL 190.40 (subd 2) provides, in pertinent part, that "[a] witness who gives evidence in a grand jury proceeding receives immunity [as a result of his testimony] unless: (a) He has effectively waived such immunity pursuant to section 190.45". CPL 190.45, in turn, provides as follows:

"1.  A waiver of immunity is a written instrument subscribed by a person who is or is about to become a witness in a grand jury proceeding, stipulating that he waives his privilege against self-incrimination and any possible or prospective immunity to which he would otherwise become entitled, pursuant to section 190.40, as a result of giving evidence in such proceeding.

"2.  *A waiver of immunity is not effective unless and until it is sworn to before the grand jury conducting the proceeding* in which the subscriber has been called as a witness." (Emphasis supplied.)

In the case before us, the individual defendant (Charles L. Lyon) requested an appearance before the Grand Jury, and pursuant to that request he was notified, *inter alia*, of a time at which to appear before that body. Upon his appearance, the following exchange occurred between himself, his attorney (Thomas Watson) and the Assistant District Attorney (Moses Weintraub) in the presence of the Grand Jury and prior to his testimony:

"Mr. Lyon, is it your request that you appear this morning before the Grand Jury?

"MR. LYON: It is.

"MR. WEINTRAUB: Before you appear before the Grand Jury, are you aware that you are required to sign a waiver of immunity?

"MR. LYON: I am.

"MR. WEINTRAUB: And that anything you testify to under this waiver can be used against you at any trial or any future proceedings in this matter?

"MR. LYON: I understand that.

"MR. WEINTRAUB: Do you also understand that, by signing this waiver of immunity, you must answer each and every question I put to you, and you cannot claim your privilege against self-incrimination as to any question I put forth to you?

"MR. LYONS: I do.

"MR. WEINTRAUB: Do you also understand that any untruthful answers by you could result in an indictment for perjury?

"MR. LYONS: I do.

"MR. WEINTRAUB: First, I want to mark the letter from your attorney as Grand Jury Exhibit Number 52 in evidence.

"(The above-referred to letter was received and marked as Grand Jury Exhibit Number 52 in evidence; 6-20-80, J.D.)

"(Mr. Watson entered the Grand Jury Chamber.)

"MR. WEINTRAUB: Mr. Lyon, I am going to hand you a waiver of immunity before the Grand Jury and ask you to read it and consult with your attorney before you sign it (handing).

"MR. WATSON: Do you have any questions?

"MR. LYON: I want to talk to you.

"A JUROR: Any consultation between the attorney and the witness—they will have to retire to consult and then come back.

"MR. WATSON: Fine. Thank you.

"(Mr. Watson and Mr. Lyon left the Grand Jury Chamber and subsequently returned.)

"MR. WEINTRAUB: Mr. Lyon, you have had an opportunity to consult with your attorney; is that correct?

"MR. LYON: That's true, sir.

"MR. WEINTRAUB: He has explained to you the consequences of your signing this waiver of immunity?

"MR. LYON: He has.

"MR. WEINTRAUB: Do you still wish to sign this waiver of immunity?

"MR. LYON: I do.

"MR. WEINTRAUB: Please sign it.

"(Witness signed document.)

"MR. WEINTRAUB: Mr. Lyon, you have signed this waiver of immunity, and you are fully cognizant of what your rights are as a result of the signing of this waiver; is that correct?

"MR. LYON: Yes.

"MR. WEINTRAUB: Your attorney has fully conferred with you as to what your rights and liabilities are as a result of your signing this waiver?

"MR. LYON: He has.

"MR. WEINTRAUB: Is it still your desire to testify pursuant to this waiver?

"MR. LYON: It is.

"MR. WEINTRAUB: Kindly mark the waiver of immunity as Grand Jury Exhibit Number 53 in evidence.

"(Waiver of immunity before Grand Jury signed by Charles Lyon was received and marked as Grand Jury Exhibit Number 53 in evidence; 6-20-80, J.D.)

"MR. WEINTRAUB: Mr. Lyon, will you kindly raise your right hand and be sworn in by the Foreman.

"(The witness complied.)

"THE FOREMAN: Do you swear in the presence of the ever-living God that the evidence you shall give to the Grand Jury upon this Complaint shall be truth, the whole truth, and nothing but the truth, so help you God?

"THE WITNESS: I do.

"THE FOREMAN: Please be seated."

The record therefore clearly indicates that the individual defendant willingly signed the waiver of immunity in the presence of the Grand Jury, with the assistance of counsel, and only after being fully apprised of his rights. In addition, there appears above the foreman's signature on the actual waiver document a printed jurat bearing the notation "subscribed and sworn to before me this 20th Day of June, 1980", although the record reveals that the defendant did not formally raise his right hand and recite that he swore to the waiver in the Grand Jury chamber. In our view,

the foregoing constituted sufficient compliance with CPL 190.45 (subd 2) to render the instant prosecution proper.

The statute in question (CPL 190.45, subd 2) does not prescribe a specific ceremony for swearing to the waiver of immunity before the Grand Jury. This being so, the decision of the Court of Appeals in *Bookman v City of New York* (200 NY 53, 56) takes on significance, for the court there stated with regard to the form of an oath in general that "[w]hatever the form adopted, it must be in the presence of an officer authorized to administer it, and it must be an unequivocal and present act by which the affiant consciously takes upon himself the obligation of an oath."

In our view, the first *Bookman* requirement was satisfied in the case at bar by the signing of the waiver instrument in the presence of the Grand Jury foreman (see CPL 190.25, subd 2). In addition, we believe the defendant's signature on a document bearing the printed legend "SUBSCRIBED AND SWORN TO BEFORE ME THIS . . . . . DAY OF . . . . . . . . , 19    " evinces an intention that the document in question operate as a sworn statement, so that by the signing of the instrument in the presence of the Grand Jury the defendant satisfied the second *Bookman* requirement of taking upon himself "the obligation of an oath" *(Bookman v City of New York, supra,* p 56). Especially is this so in light of the fact that a defendant's right to appear and give testimony before a Grand Jury is expressly conditioned upon his "signing and submitting to the grand jury a waiver of immunity pursuant to" CPL 190.45 (CPL 190.50, subd 5, par [b]; see *People v Ellwanger,* 99 Misc 2d 807; *People v Rodriguez,* County Ct., Montgomery County, Feb. 1, 1979, WHITE, J., affd 77 AD2d 820, mot for lv to app den 51 NY2d 884), and that the defendant herein had the benefit of counsel during his Grand Jury appearance, a benefit specifically conferred by CPL 190.52 (subds 1, 2) in exchange for the execution of a waiver of immunity (see *Matter of Lief v Hynes,* 98 Misc 2d 817; see, also, Bellacosa, Practice Commentary, McKinney's Cons Laws of NY, Book 11A, CPL 190.52, 1972-1980 Supp Pamphlet, pp 111-112). Thus, the defendant fully expected to waive immunity in exchange for the opportunity to appear and testify before the Grand Jury.

Under the totality of circumstances, we therefore conclude that there has been sufficient compliance with the requirements of CPL 190.45 (subd 2) to render the waiver of immunity effective (see, generally, *Matter of Reports of Saratoga County Grand Jury for March, 1979 Term,* 77 AD2d 399, 402; *People v Rodriguez, supra; People v Ellwanger, supra; People v Rice,* 93 Misc 2d 182; cf. *People v Gerald,* 91 Misc 2d 509). We have considered the defendants' remaining contention and find it to be without merit.

The order of the Supreme Court, Suffolk County, should therefore be reversed insofar as appealed from and the affected counts of the various indictments reinstated as against each of the several defendants.

DAMIANI, J. P., MANGANO and RABIN, JJ., concur.

Order of the Supreme Court, Suffolk County, dated October 20, 1980, reversed insofar as appealed from, on the law, the affected counts of the indictments are reinstated and the cases are remitted to Criminal Term for further proceedings on the indictments.