OPINION OF THE COURT
Howard E. Goldfluss, J.
Sentry Armored Courier Corporation, one of the defendants named herein, serves its clients by protecting their funds.
*561 A multimillion dollar theft was discovered on the morning of December 13, 1983, in Sentry’s office and garage located at 3548 Boston Road in The Bronx. Four males were arrested by agents of the Federal Bureau of Investigation charging them with complicity in the theft. They were prosecuted in the United States District Court, Southern District, and after conviction for larceny, conspiracy and related crimes, were sentenced to various terms of imprisonment and fines. Neither the United States Attorney nor the District Attorney of Bronx County submitted evidence which connected the defendants herein with the commission or complicity in those particular crimes. However, the Bronx District Attorney conducted a separate inquiry into the reported disappearance of a money bag containing approximately $225,000 from Sentry. Though that loss was not criminally attributable to the defendants, the investigation brought to light certain criminal charges contained in the indictments herein. The defendants stand charged with grand larceny in the second degree and misapplication of property. All of the defendants move to dismiss the indictments pursuant to CPL 210.30.
Sentry, as a common course of its business, entered into agreements with its clients for the specific purpose of providing ready funds for check cashing and other inventory needs. In July of 1981, Sentry entered into such an agreement with Chemical Bank. By the terms of said contract, Sentry was to service Waldbaum’s, a customer of Chemical, by providing Waldbaum’s outlets with ready cash.
On May 24, 1982, Sentry’s Chairman, Kuno Laren,* John Jennings and Angela Fiumefreddo, both Vice-Presidents of Sentry, opened a corporate checking account with Citibank. The sum of $100,000 was deposited in what was known as a compensatory balance account. Sentry had previously borrowed $400,000 from Citibank and the $100,000 deposit effectuated a lower rate on the loan. Thus, Sentry gained a direct monetary benefit from the deposit.
*562 The source of the $100,000 was the “rolling inventory account” that Sentry maintained in its storage facility on behalf of Waldbaum’s. Neither Waldbaum’s nor Chemical Bank gave Sentry permission, express or implied, to make such use of these funds. -
In addition to the Waldbaum’s agreement, Chemical and Sentry entered into a separate agreement in July, 1981. It provided that Sentry would collect Chemical Bank “bulk funds”, “fine count” the money, and within 72 hours, deposit it in Chemical Bank’s account at the Federal Reserve Bank, a standard industry practice. Nowhere in the Grand Jury testimony is it alleged that timely deposit of the funds within the prescribed 72-hour period was not made, nor is it alleged that there was at any time a shortage in the deposit of such funds.
In July of 1981, Lance Mead, an officer of Sentry entered into an agreement with defendant John Finnerty, then a Senior Vice-President of Hudson Valley National Bank. The purpose and aim of this agreement was for Sentry to realize a monetary benefit through interest paid by Hudson Valley for “in and out” money — that is, deposited and withdrawn within the 72-hour period. To accomplish this, Sentry deposited cash funds taken from the Waldbaum’s inventory.
Before the 72-hour expiration, Sentry withdrew the principal and wired such sums into the Chemical account at the Federal Reserve. However, the interest on these short time deposits remained on deposit in Sentry’s account at Hudson Valley. Thus the principal was fully accounted for, but the interest accrued solely to the benefit of Sentry.
In January of 1983, after the publicized multimillion dollar larceny, Sentry had an audit made of its financial condition. The audit revealed that Chemical’s rolling inventory account was $138,000 short. Sentry acknowledged the shortage, and sought to withdraw the $100,000 plus interest from Citibank, which as previously stated was deposited for the purpose of securing a more favorable interest rate on $400,000 pre-existing loan. The withdrawal was refused by Citibank, under a freeze order by *563 Chemical Bank of all Sentry’s assets to secure payment for any deficit an audit would show.
On January 11, 1983, Chemical demanded payment in the sum of $97,393, which represented the balance still due on the rolling inventory account, and the sum was in fact recovered from the frozen funds deposited in Citibank.
It is important to note that in a prior related decision, a Justice of this court made a factual finding from the submitted papers in a similar motion. That court determined that as of January 14, 1983, Chemical’s indebtedness to Sentry exceeded Sentry’s indebtedness to Chemical. This setoff negates any criminal intent and in fact is an absolute defense to the charge of misapplication of property (Penal Law, § 165.00). But even if this were not so, Sentry’s actions utilizing the cash for its own benefit for the two- or three-day period would not violate the statute. In order to be guilty of the applicable section, Sentry and/or its officers who participated in these transactions, would have to “loan, lease, pledge, pawn or otherwise encumber such property without the consent of the owner thereof in such [a] manner as to create a risk that the owner will not be able to recover it or will suffer pecuniary loss”. (Penal Law, § 165.00, subd 1; emphasis added.)
In reading the Grand Jury testimony, it is clear to this court that such could not be the consequence of defendants’ actions. Concededly, they did not have permission from Chemical to use the funds for a favorable rate on a preexisting loan, or to gain two- or three-day unauthorized interest. But depositing escrow funds in a Federally insured depository cannot be termed a risk under any stretch of the imagination. On the contrary, it would be difficult to set forth a safer course of conduct for the protection of the beneficiary. Unquestionably, the hearts of Sentry and its officers were not as pure as the driven snow, but no risk was created likely to cause Chemical to suffer a pecuniary loss.
The more vital question is whether the defendants’ actions constituted larceny. The crime of larceny requires an intent to deprive another of property or to appropriate the same to himself or a third person. The accused must have *564 taken, obtained, or withheld such property from the true owners.
Under the facts and circumstances of this case, “deprived” seems to be the crucial element. Deprive is defined in subdivision 3 of section 155.00 of the Penal Law, as the withholding of property from the owner permanently or for an extended period or under such circumstances that the major portion .of its economic value is lost to him or to render it unlikely that the owner will recover the property.
Thus, the subject of the larceny can only be the interest acquired by the unauthorized use of Chemical’s funds. Do the actions of the defendants satisfy the requirements of the essential element of intent?
The New York Court of Appeals in People v Ryan (41 NY2d 634) responded in the negative, in a case where the actions of the defendant were similar to the alleged acts of the defendants herein. Ryan was a partner in a bond brokerage business. He had an approved line of credit with a bank from which he would borrow money periodically for various business purposes. In this particular instance, he had borrowed money for the purchase of municipal bonds for the account of a customer. He used these bonds as collateral for a loan to his company. Eventually, Ryan’s firm ran into difficulty, and was unable to repay the loan. The bonds were sold by the bank with the proceeds applied to the repayment. Ryan filed in bankruptcy, and the customer filed a complaint with the District Attorney.
In a clear, concise and cogent opinion by Judge Gabrielli, writing for the majority, the court indicated that the element of intent was not satisfied in the Ryan (supra) case — and using that rationale, it is not satisfied here. A high standard of proof is required to establish intent. (See People v Newman, 80 Misc 2d 975.) In Ryan, the court equated that standard with the rule used in circumstantial evidence cases; “ ‘[Wjholly consistent with guilty intent or belief, and wholly inconsistent with innocent intent or belief’ ” (People v Ryan, 41 NY2d 634, 639; see People v Borrero, 26 NY2d 430; People v Bearden, 290 NY 478). The inference of intent must be logically compelling and must exclude only “logical gaps” — that is — “subjective inferential links based on [possibilities] of low grade or insuffi *565 cient degree — which, if undetected [eliminates] coincidence and, therefore, suspicion into permissible inference.” (See People v Cleague, 22 NY2d 363, 367.)
In reversing Ryan’s conviction, the court cautioned against drawing such inferences of intent to utilize a charge of larceny for a “mere civil wrong” (People v Ryan, 41 NY2d 634, 640). The facts herein create a classic illustration of where and when such admonition should be followed.
The defendants Sentry Armored Courier Corporation and John Jennings had been previously indicted for insurance fraud in the first and second degrees. Charges were dismissed by a Justice of this court for defects in the District Attorney’s charge in the Grand Jury. While the superseding indictments do not repeat those charges, it is important to refer to them to determine whether the reinstatement of these counts in any future indictment could be sustained based on the Grand Jury testimony. Such testimony was given by several claimants who had suffered pecuniary losses because of thefts from Sentry. Chubb Group insured Sentry against such losses. Sentry presented a list of clients to Chubb for payment. When payment was made to Sentry for the benefit of these claimants, Sentry compensated only some of the claimants. It appears from the Grand Jury testimony that the amounts paid to Sentry were inadequate to compensate them all.
Section 176.05 of the Penal Law defines insurance fraud as a presentation of a fraudulent or false statement to an insurer for the issuance of rating of an insurance policy, or for a claim for payment or other benefit. To be guilty, a person must (1) submit the statement or claim knowing that it contains materially false information concerning any fact material thereto, or (2) conceal, for the purpose of misleading, information concerning any facts material thereto. The statute is directed against “fraudulent activities related to the business of insurance.” (See Hechtman, Practice Commentary, McKinney’s Cons Laws of NY, Book 39, 1983-1984 Pocket Part, Penal Law, § 176.00, p 123.) It contemplates fraud in the inducement, either on the issuance of a policy or the payment of a claim. If any malfeas *566 anee existed here, it occurred after the payment of the claim was made, and as in the other counts, the Grand Jury testimony lacks the basis for a finding of criminal intent. Unquestionably, the third-party beneficiaries would be entitled to legal redress, but we are not dealing with a civil matter herein.
The basis of dismissal of the previous indictments was the inadequacy of legal instructions to the Grand Jury. This court need not address itself as to whether these defects were remedied in the superseding indictments because the decision herein addresses itself to the substance of the testimony which does not sustain any of the counts set forth in these indictments. The said indictments are therefore dismissed.

 Indictment 637/83, charging Kuno Laren with grand larceny, conspiracy and misapplication of property was dismissed on November 21, 1983, by a Justice of this court, with leave to resubmit by the People. This court dismissed the indictment finally on February 7, 1984.