OPINION OF THE COURT
Titone, J.
On December 13, 1982, the Sentry Armored Courier Corp. warehouse in Bronx County was burglarized and robbed of some $11 million by individuals unconnected to Sentry, who were later apprehended and prosecuted. In the aftermath of the robbery, the Bronx County District Attorney’s office focused its attention on Sentry’s-own business practices. A series of indictments charging Sentry and its principals with various counts of larceny and misapplication of property ensued. The question presented for our consideration is whether the indictments’ allegations concerning defendants’ handling of the money entrusted to their care would, if proven, support convictions for the crimes charged.
*112 I. PROCEDURAL HISTORY
The six indictments presently before us collectively charge defendants John Jennings, Angela Fiumefreddo, John Finnerty, Sentry Armored Courier Corp. and Sentry Investigations Corp. with several counts of grand larceny in the second degree and misapplication of property. At the time the indictments were issued, Sentry was principally engaged in transporting and storing large sums of cash and performing related services on behalf of its clients. Defendant Jennings was the president of the Sentry Armored Courier Corp., defendant Fiumefreddo was the senior vice-president of that corporation, and defendant John Finnerty was the vice-president and cashier of the Hudson Valley National Bank, which played a role in one of the alleged misappropriation "schemes.”
The case has a complex factual and procedural history. The larceny and misapplication charges arose out of four separate courses of conduct, which the People claim demonstrate defendants’ criminal mishandling of their clients’ funds. The first Grand Jury to consider the People’s evidence handed up five indictments. Of these, three were dismissed entirely by Justice Vitale, with leave to re-present. The other two indictments were sustained against defendants Jennings and Fiumefreddo but dismissed against the only named corporate defendant, Sentry Armored Courier Corp. The second Grand Jury handed up four new indictments, naming Jennings, Fiumefreddo, Finnerty, Sentry Armored Courier Corp. and Sentry Investigations Corp. as defendants. All six outstanding indictments were dismissed by the then Presiding Judge, Justice Goldfluss, on the ground that the proof before the Grand Jury was legally insufficient (see, 123 Misc 2d 560). Two of the indictments, which named Jennings and Fiumefreddo as defendants, were reinstated on the People’s appeal to the Appellate Division, and the People, as well as defendants Jennings and Fiumefreddo, were granted leave to take cross appeals to this court.
II. THE THRESHOLD PROCEDURAL ISSUES
Initially, the People advance a number of procedural arguments in support of their position. First, they contend that all counts against Fiumefreddo and the corporate defendants should be reinstated because, unlike defendants Jennings and Finnerty, the corporate defendants did not make written motions to dismiss the new indictments ágainst them and *113 Fiumefreddo failed to move in writing either to dismiss the new indictment or to reargue Justice Vitale’s prior denial of her motion to dismiss (see, CPL 210.45 [1]). Second, the People contend that defendant Jennings’ written dismissal motion was flawed because it referred, in part, to an indictment that had been superseded, rather than to the replacement indictment. Finally, the People argue that those counts remaining from the first Grand Jury presentment, which had survived a dismissal motion before Justice Vitale, should not have been dismissed by Justice Goldfluss but instead should have been referred to Justice Vitale for reargument under the mandate of CPLR 2221.
We agree with the People that under CPL 210.45 (1) a defendant must provide them with written notice of and a reasonable opportunity to respond to a motion to inspect and dismiss an indictment made under CPL 210.20. However, by failing to complain of the flaws they now assert, by either raising the problem before Justice Goldfluss made his decision or moving for reargument within a reasonable time thereafter, the People in this case waived their right to insist upon conformity with the procedural requirements of CPL 210.45 (1) (see, People v Singleton, 42 NY2d 466, 470-471). Unlike the timing requirements of CPL 210.20 (2) and 255.20, the written notice requirement of CPL 210.45 (1) is not directly related to "the strong public policy to further orderly trial procedures and preserve scarce trial resources” (People v Lawrence, 64 NY2d 200, 207; see also, Matter of Veloz v Rothwax, 65 NY2d 902; People v Key, 45 NY2d 111; People v Selby, 53 AD2d 878, affd 43 NY2d 791). Rather, the rule’s principal purpose is to ensure that the People have fair notice of the claims that the moving defendant intends to present to the court. Inasmuch as the requirements of CPL 210.45 (1) are designed primarily to protect the People from unfair surprise, no overriding public policies are offended by treating the People’s silence as a waiver of their right to written notice under that statute (cf People v Lawrence, supra). We note that the People here have not shown how they were prejudiced either by the failure of Fiumefreddo and the corporate defendants to make formal written submissions or by the failure of defendant Jennings correctly to identify by number each indictment he was challenging.
Similarly, while we agree that, unless Justice Vitale was unavailable for referral, Justice Goldfluss should not have dismissed the counts that Justice Vitale had previously upheld *114 (see, People v Petgen, 55 NY2d 529, 534; see also, CPLR 2221), we conclude that the People’s present argument presents no ground for reversal. Because of the People’s failure timely to protest Justice Goldfluss’ action, the present record is barren of facts from which we might conclude that Justice Vitale was available and able to entertain the motion had it been transferred to him by his colleague (see, CPLR 2221). Hence, we cannot say that the rule against collateral vacatur was violated here (see, Spahn v Griffith, 101 AD2d 1011; cf. Hess v Wessendorf, 102 AD2d 926; Willard v Willard, 194 App Div 123; see also, Blasi v Boucher, 30 AD2d 674).[1]
III. THE PROPER STANDARD FOR REVIEW
Having determined that there are no procedural grounds for upsetting the Appellate Division order, we turn now to the proper standard for reviewing the sufficiency of evidence before a Grand Jury. The Grand Jury may not indict unless the People present evidence establishing a prima facie case of criminal conduct (see, People v Dunleavy, 41 AD2d 717, affd 33 NY2d 573). The sufficiency of the People’s presentation is properly determined by inquiring whether the evidence viewed in the light most favorable to the People, if unexplained and uncontradicted, would warrant conviction by a petit jury (see, People v Pelchat, 62 NY2d 97, 105).
In granting the motions to dismiss all of the indictments in this matter, however, the reviewing Justice erroneously applied a higher standard to determine whether the People’s circumstantial evidence of a larcenous intent was sufficient. Citing People v Ryan (41 NY2d 634), People v Borrero (26 NY2d 430), People v Cleague (22 NY2d 363), People v Bearden (290 NY 478) and People v Newman (80 Misc 2d 975, affd 85 Misc 2d 761), the court demanded that the People’s evidence be " ' "wholly inconsistent with innocent intent or belief’ ’ ” (123 Misc 2d 560, 564). The cases cited to justify this heightened scrutiny, however, only addressed the question whether the circumstantial evidence of larcenous intent adduced at trial supported a petit jury’s finding that guilt was established beyond a reasonable doubt. Manifestly, such cases are not controlling on a motion to dismiss an indictment prior to trial *115 (see, People v Dunleavy, 41 AD2d 717, affd 33 NY2d 573, supra).[2]
The Criminal Procedure Law provides that a Grand Jury may indict a person when the evidence before it both establishes all the elements of the crime and also establishes reasonable cause to believe that the accused committed the crime to be charged (CPL 190.65 [1]). The first prong requires that the People present a prima facie case; the second dictates the degree of certitude grand jurors must possess to indict. It is thus clear from the statute that the applicable degree of certitude is "reasonable cause,” not "beyond a reasonable doubt” or "moral certainty” where the principal proof of guilt is circumstantial. Furthermore, on a motion to dismiss an indictment under CPL 210.20 (1) (b), the inquiry of the reviewing court is limited to the legal sufficiency of the evidence; the court may not examine the adequacy of the proof to establish reasonable cause, since that inquiry is exclusively the province of the Grand Jury. As we said in People v Sabella (35 NY2d 158, 167): " ' "Legally sufficient evidence” means competent evidence which, if accepted as true, would establish every element of an offense charged and the defendant’s commission thereof * * *’ In determining whether the People have reached this stage, all questions as to the quality or weight of the proof should be deferred. In other words if the prosecutor has established a prima facie case, the evidence is legally sufficient 'even though its quality or weight may be so dubious as to preclude indictment or conviction pursuant to other requirements.’ To further illustrate the point the Commission Staff noted that 'evidence may be "legally sufficient” to support a charge although it does not prove guilt "beyond a reasonable doubt,” and for that matter, although it does not even provide "reasonable cause” to believe that the defendant committed the crime charged.’ (See Commission Staff Comment to Proposed CPL 35.10, now CPL 70.10.)” (See, also, People v Mayo, 36 NY2d 1002, 1004.)
*116 With these standards in mind, we will now address the substantive arguments raised by the parties on these cross appeals. Since the various counts we have been asked to consider arise from four discrete sets of facts, we deem it appropriate to evaluate each group of charges separately.
IV. THE REPURCHASE AGREEMENT PLAN
Indictments Nos. 4379/83, 4380/83 and 370/84, on which the named defendants are John Jennings, John Finnerty, Sentry Armored Courier Corp. and Sentry Investigations Corp., all concern a business practice that the People have dubbed the "Repurchase Agreement Scheme.” All of the counts in these indictments were dismissed by the trial court, and the dismissals were upheld on the People’s appeal to the Appellate Division. We agree with the Appellate Division that the facts presented to the Grand Jury were legally insufficient to support the charges of second degree grand larceny and misapplication of property that were contained in these indictments.
Taken in the light most favorable to the People, the evidence before the Grand Jury showed that Sentry had an agreement with its client, Chemical Bank, under which Sentry was to pick up from Chemical’s Water Street offices certain "bulk deposits” that Chemical had received from its commercial customers. Sentry was to "fine count” this money in its warehouse and then deliver it within 72 hours to Chemical’s account at the Federal Reserve Bank in lower Manhattan, reporting any overages or shortages discovered in the counting process.[3] In fact, Sentry was able to perform the "fine counting” task in approximately 24 hours, considerably less time than the 72 hours its agreement with Chemical allowed.
Reluctant to retain all of the cash on Sentry’s premises for the full 72-hour period, defendant Jennings met with defendant Finnerty, an officer of Hudson Valley National Bank, and arranged for the "fine counted” money to be delivered to Hudson’s account at the Federal Reserve Bank, with the funds *117 to be credited to Sentry’s newly created escrow account with Hudson. Once the funds were delivered, an employee of Sentry was to call Hudson and specify the amount that was to be used to buy "repurchase agreements” from that bank. Under these "repurchase agreements,” which were analogous to loans or bonds, Hudson was given the right to invest the money, while Sentry’s account was debited in an appropriate amount. The loan was secured by A-rated bonds held in Hudson’s Federal Reserve Bank vault. At the conclusion of the 72-hour period Sentry had to deposit Chemical’s money in its Federal Reserve account, Hudson would "repurchase” the bonds from Sentry by crediting Sentry’s escrow account with the principal amount plus a portion of the interest Hudson had earned on its investments. On telephone orders from Sentry’s employee, Hudson would then wire transfer the principal amount to Chemical’s account at the Federal Reserve Bank, leaving Sentry’s account enriched by the amount of the interest payment.
The "repurchase agreement” plan was implemented in July of 1981. By late August, Chemical had noticed that its funds were being routed through Hudson and demanded an explanation. Although an officer of Sentry told Chemical’s representative that the rerouting had been initiated for "insurance purposes,” Chemical was evidently unsatisfied and directed Sentry, both orally and in writing, to deliver the "fine counted” money directly to Chemical’s account at the Federal Reserve Bank. Despite this admonition, Sentry continued its practice of routing the money through Hudson until November of 1981, when Chemical decided it could "fine count” its bulk deposits internally. During the period when its arrangement with Hudson was in effect, Sentry gained a total of nearly $17,000 in interest earned on over 40 "repurchase agreements.” The full amount of the principal belonging to Chemical, however, was always returned to its owner within the allotted 72-hour time frame.
The People have advanced several theories in support of their larceny charge, including a "breaking of the bale” and an unlawful "separation] of the value of the money from its engraved ink and paper container.” None of the theories the People have proffered, however, would support a larceny conviction under our modern statutes defining that crime. While Sentry’s conduct may have provided a basis for civil liability in some form, that conduct did not constitute criminal larceny.
*118 The crime of larceny consists of an unauthorized taking, coupled with the "intent to deprive another of property or to appropriate the same” (Penal Law § 155.05 [1]). The terms "deprive” and "appropriate” are specifically defined in Penal Law § 155.00:
"3. 'Deprive.’ To 'deprive’ another of property means (a) to withhold it or cause it to be withheld from him permanently or for so extended a period or under such circumstances that the major portion of its economic value or benefit is lost to him, or (b) to dispose of the property in such manner or under such circumstances as to render it unlikely that an owner will recover such property.
"4. 'Appropriate.’ To 'appropriate’ property of another to oneself or a third person means (a) to exercise control over it * * * permanently or for so extended a period or under such circumstances as to acquire the major portion of its economic value or benefit, or (b) to dispose of the property for the benefit of oneself or a third person” (emphasis supplied).
As one commentator has noted, the concepts of "deprive” and "appropriate,” which "are essential to a definition of larcenous intent,” "connote a purpose * * * to exert permanent or virtually permanent control over the property taken, or to cause permanent or virtually permanent loss to the owner of the possession and use thereof’ (Hechtman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law § 155.00, p 103). The intent element of larceny is therefore very different in concept from the "taking” element, which is separately defined in the statute (Penal Law § 155.05 [1], [2]; see, Penal Law § 155.00 [2]) and is satisfied by a showing that the thief exercised dominion and control over the property for a period of time, however temporary, in a manner wholly inconsistent with the owner’s continued rights (see, People v Olivo, 52 NY2d 309, 318; People v Alamo, 34 NY2d 453, 457-458). Indeed, in People v Olivo (supra, at pp 315-319), where we discussed the principles underlying the "taking” element at length, we noted that "the intent prescribed by [Penal Law § 155.05 (1)]” must be separately considered (52 NY2d, at p 318, n 6).
The "taking” element of the crime of larceny was established prima facie here, since for certain periods, however temporary, defendants exercised dominion and control over Chemical’s funds in a manner that could be found to be wholly inconsistent with Chemical’s ownership (see, People v *119 Olivo, supra, at pp 316-318; People v Alamo, supra, at pp 457-458). Such a finding could be based on the facts that defendants used Chemical’s money for their own purposes and continued to do so even after Chemical specifically directed them to stop. What is lacking here from the People’s proof is evidence demonstrating an "intent to deprive * * * or to appropriate” (Penal Law § 155.05 [1]).
The gist of the People’s claim is that by investing Chemical’s money for periods up to 48 hours, defendants evinced an intent to deprive its true owner of the money’s "economic value or benefit,” that is, the interest that the money was capable of generating. The mens rea element of larceny, however, is simply not satisfied by an intent temporarily to use property without the owner’s permission, or even an intent to appropriate outright the benefits of the property’s short-term use.
The problem presented in this case is similar to that presented in "joy-riding” cases, in which it was held that the intent merely to borrow and use an automobile without the owner’s permission cannot support a conviction for larceny (e.g., Van Vechten v American Eagle Fire Ins. Co., 239 NY 303, 305; People v Kenney, 135 App Div 380, 382-383).[4] An analysis of the evidence before the Grand Jury in this case indicates only that defendants exercised control over Chemical’s money to the extent of using it to make short-term, profitable investments and, as a result, appropriated some portion of its economic benefit for themselves. However, in light of the fact that their unauthorized use of Chemical’s money extended over no more than a series of discrete 48-hour periods, the proof was insufficient to show that they intended to use Chemical’s money "for so extended a period or under such circumstances as to acquire the major portion of its economic value or benefit” (emphasis supplied).[5]
*120 Moreover, the "economic value or benefit” to be derived from the money was the interest or other financial leverage that could be gained by the party who possessed it. Inasmuch as Chemical had ceded possession of its money to Sentry for various 72-hour periods, it had no legal rights during those periods to the money’s "economic value or benefit,” which is an incident of possession (see, Matter of Surrey Strathmore Corp. v Dollar Sav. Bank, 36 NY2d 173). Thus, to the extent that defendants intended to appropriate to themselves the "economic value or benefit” of Chemical’s money, it cannot be said that their intentions were unlawful or even inconsistent with the terms of the bailment. Significantly, the People did not place the agreement between Sentry and Chemical before the Grand Jury. As a consequence, not only was there no proof of any express restrictions on Sentry’s disposition of Chemical’s money during the 72-hour period allotted for "fine counting,” but there was not even proof that Chemical had a right to expect early return of its money if the "fine counting” process were completed before the expiration of that period.
For similar reasons it cannot be said that defendants committed larceny by intentionally and permanently stealing the interest earned on Chemical’s money, as distinguished from the money itself. First, absent proof of an agreement to the contrary, Chemical cannot be deemed the true owner of the interest earned while its money was in defendants’ custody pursuant to the parties’ "fine counting” agreement (see, Matter of Surrey Strathmore Corp. v Dollar Sav. Bank, supra).[6] Indeed, there is really no practical difference between the contention that defendants stole the interest on Chemical’s money and the contention that they stole the money itself by intentionally appropriating its "economic value or benefit.”
*121 Second, it would be inconsistent with the statutory design to treat defendants’ concededly permanent taking of the interest earned on Chemical’s funds as a larceny within the meaning of Penal Law §§ 155.00, 155.05 and 155.35. It is clear that an individual who "joy-rides” and thereby deprives the automobile’s owner of the value arising from its temporary use is not liable in larceny for stealing that intangible "value” under article 155 of the Penal Law (see, Van Vechten v American Eagle Fire Ins. Co., supra). By parity of reasoning, an individual who temporarily invests another’s money and thereby gains interest or profit cannot be deemed guilty of larceny for appropriating that interest or profit. Consistent with our long-held view that criminal liability " ' "cannot be extended beyond the fair scope of the statutory mandate” ’ ” (People v Gottlieb, 36 NY2d 629, 632), we hold that in these circumstances the statute must be read to apply only to a taking of the property itself and not to a permanent taking of what is, in essence, only the economic value of its use during the short time the property has been withheld.
Finally, we note that neither Sentry’s patently false response to Chemical’s inquiry concerning the rerouting of its money through Hudson nor Sentry’s disobedience when ordered by Chemical to deliver the money directly are sufficient to establish that Sentry was acting with the larcenous intent required by Penal Law § 155.00 (3), (4) and § 155.05 (1). At worst, Sentry’s conduct demonstrates its unwillingness to relinquish what was obviously a profitable short-term use of Chemical’s money. It does not, however, alter the inescapable and uncontradicted inference that Sentry was merely emulating the behavior of many reputable financial institutions by taking advantage of the "float” on the temporarily idle money in its possession.
Having determined that the People’s proof did not establish a larceny, we turn now to the question whether it was sufficient to establish the lesser crime of misapplication of property, which is defined in Penal Law § 165.00 (1) as follows: "A person is guilty of misapplication of property when, knowingly possessing personal property of another pursuant to an agreement that the same will be returned to the owner at a future time, he loans, leases, pledges, pawns or otherwise encumbers such property without the consent of the owner thereof in such manner as to create a risk that the owner will not be able to recover it or will suffer pecuniary loss.”
*122 The obvious thrust of this statute, which we have not previously construed, is to make it a crime to alienate in any way property belonging to another under circumstances creating a risk of loss. While the created risk of loss need not rise to the level of "likelihood” or even mere "probability,” the statute does require proof of a risk that is more than a farfetched or wholly speculative possibility.
In this case, although the evidence before the Grand Jury was sufficient to support a finding that the "repurchase agreements” were the equivalent of a "loan” to Hudson Valley Bank within the meaning of this statute, that evidence, even when viewed in the light most favorable to the People, was insufficient to support the misapplication charge because of the absence of proof that these loans were made "in such manner as to create a risk” of loss. There was no actual risk here that the money would not be repaid, since even in the unlikely event of a default by Hudson, the "loans” to Hudson were secured by A-rated bonds held in Hudson’s Federal Reserve Bank vault. Indeed, these "agreements” were deemed so secure by the industry that, as the undisputed testimony shows, no FDIC insurance was required.[7]
We reject the People’s present contention that the use of wire transfers created a legally cognizable risk of loss through electronic accident or deliberate computer hijacking. There is nothing on the present record to demonstrate that such a risk in fact existed and, absent meaningful proof, such an alleged source of risk is far too speculative and remote to support an indictment under Penal Law § 165.00 (1). Similarly, we decline to adopt the People’s view that the statute was violated because defendants encumbered Chemical’s money in such a way as to create a risk that the exact same bills entrusted to Sentry would not be recovered. Inasmuch as money is quintessentially fungible property, the certainty that the exact same amount of money will be recovered is enough to defeat application of the statute.
Finally, we note that even if the "creation of risk” element of Penal Law § 165.00 (1) had been satisfied, we would nonetheless affirm the dismissal of the misapplication counts in indictments Nos. 4379/83, 4380/83 and 370/84, since the *123 defense set forth in Penal Law § 165.00 (2) was established before the Grand Jury as a matter of law. As the undisputed evidence showed, defendants had promptly "recovered possession” of all of Chemical’s money and Chemical "suffered no material economic loss” as a result of the "repurchase agreements.” Furthermore, indictment No. 4380/83 against defendant Finnerty was properly dismissed for the additional reason that there was absolutely no evidence to show that he had knowledge of any breach of agreement by Sentry, assuming that there was such a breach (see, Penal Law § 165.00 [1]).
In short, however unethical defendants’ conduct may have been, it did not constitute the crimes of larceny or misapplication of property. Accordingly, the indictments charging those crimes were properly dismissed.
V. THE COMPENSATORY BALANCE MATTER
Another set of charges against Jennings and Fiumefreddo arises from a second business arrangement that Sentry had with Chemical Bank. Under this arrangement, Sentry kept a "rolling inventory” of Chemical’s dollar bills and coins in a segregated area of its money room. This money was to be delivered to various branches of Waldbaum’s supermarket, Chemical’s customer, whenever a need for additional cash arose. Defendants allegedly took some $100,000 out of this "rolling inventory” and deposited it in a "compensatory balance” account at Citibank. Their apparent purpose in opening this account was to enable Sentry to obtain a lower interest rate on a refinanced equipment loan it had with Citibank. There were no restrictions on Sentry’s use of the "compensatory balance” account, and Sentry’s principals had full access to its funds at all times.
In late 1982, discrepancies began to appear in the amount of coins in the "rolling inventory” Sentry was storing for Chemical. An audit revealed substantial shortages in the "rolling inventory,” and, as a consequence, the chairman of Sentry’s board of directors attempted to withdraw the funds in the Citibank account. Citibank, however, refused his request and instead called in the demand portion of Sentry’s equipment loan, freezing the "compensatory balance” account in an apparent preliminary attempt to set off its claim against Sentry. On January 11, 1983, Sentry returned Chemical’s "rolling inventory” with a shortage of over $122,000. An *124 additional $25,000 in dimes was returned the following day, but Chemical never recovered the remaining $97,000.[8]
These are the basic facts that led the second Grand Jury to hand up indictment No. 369/84, which charged Jennings and Fiumefreddo with second degree grand larceny and misapplication of property. The indictment was dismissed by Justice Goldfluss, but was reinstated on the People’s appeal to the Appellate Division. We conclude, however, that the larceny count arising from the "compensatory balance” account arrangement has the same flaw as the larceny count involving the "repurchase agreement” plan, and, accordingly, we reverse the Appellate Division’s order to the extent that it resuscitated the former count.[9]
As in the case of the "repurchase agreement” indictment, the facts underlying the "compensatory, balance” account indictment demonstrate, at best, a short-term taking of the money entrusted to Sentry by its true owner, Chemical Bank. By removing the money' from the storage area where the "rolling inventory” was kept and placing it in a bank account in Sentry’s name, defendants could be found to have exercised dominion and control over the money in a manner that was inconsistent with Chemical’s ownership (see, e.g., People v Olivo, supra).
The facts before the Grand Jury, however, do not support an inference of larcenous intent, as that element is defined in Penal Law § 155.00 (3), (4) and § 155.05 (1). Again, what is lacking here is the intent permanently to deprive the owner of the funds or to exercise control over the money "for so extended a period or under such circumstances that the *125 major portion of its economic value or benefit is lost”.[10] As is true with respect to their "repurchase agreement” plan, defendants’ manifest intention here was to use the money they were holding for Chemical to their own advantage by placing it in a bank account rather than retaining it in a storage area, thereby obtaining some portion of the money’s economic value. There is no indication, however, that they intended to appropriate the money in such a way as to sap it of the "major portion” of its economic benefit. The fact that the money was ultimately lost as a result of Citibank’s exercise of its rights as a creditor does not alter this analysis, since, as the evidence before the Grand Jury made clear, defendants were not a party to and had apparently not even anticipated Citibank’s actions (cf Van Vechten v American Eagle Fire Ins. Co., supra [larceny prosecution against one who "borrowed” automobile without the owner’s consent would not lie, even though "borrower” had accident and severely damaged vehicle]). Accordingly, the dismissal of the larceny count against the defendants Jennings and Fiumefreddo should have been sustained.
We reach a different conclusion with respect to the count charging those defendants with misapplication of property in connection with the "compensatory balance” account matter. The elements of that count were satisfied by the evidence showing that defendants had encumbered Chemical’s funds in such a manner as to place them at risk. Although there was no showing that the funds in the "compensatory balance” account were expressly deposited as security for Citibank’s loan to Sentry, the bank’s right of setoff (see, e.g., Marine Midland Bank v Graybar Elec. Co., 41 NY2d 703) made those funds the indirect equivalent of security.[11] As a *126 consequence, there was a sufficient basis for the Grand Jury to infer that defendants had both "encumbered” the funds within the meaning of the statute and created a tangible risk that those funds would not be recovered. Thus, unlike the misapplication of property charge associated with the well-secured "repurchase agreements,” the misapplication charge in indictment No. 369/84 is legally supportable.
VI. ALLEGED MISAPPROPRIATION OF INSURANCE PROCEEDS
Defendant Jennings was also charged, in indictment No. 638/83, with having committed second degree larceny by failing to remit insurance proceeds to the intended beneficiaries.[12] This charge was dismissed by Justice Goldfluss but reinstated on the People’s appeal to the Appellate Division. We conclude that the Appellate Division’s disposition of this charge was incorrect and that the indictment against defendant Jennings should be dismissed.
On September 3, 1982, one of Sentry’s armored cars was robbed of more than $231,000 after having made several cash pick-ups. About two months after this robbery, which does not appear connected to the later warehouse robbery, Sentry Investigations’ insurer sent it a $20,985.54 check in full settlement of its insurance claim. This check represented payment for the losses sustained by three of . Sentry’s clients. Sentry reimbursed one of those clients, Queensboro Farm Products, for the full amount of its $18,620 loss, but did not distribute the remainder of the insurance proceeds to its other two clients, Amity Westchester and City Hospital Center of Elmhurst, each of which had sustained losses in excess of the $2,365 balance and had submitted proof of loss. Instead, Sentry retained the excess proceeds for itself, an act which led to the present second degree grand larceny charge against defendant Jennings.
*127 Defendant Jennings’ failure to use the insurance proceeds to reimburse Sentry’s clients for their losses, however, cannot serve as the basis for a larceny prosecution for the simple reason that Sentry, and not the clients, was the rightful owner of the insurance proceeds. It was Sentry that had paid for the insurance coverage, and it was Sentry, rather than its clients, that the insurer was obligated to pay in the event of loss. When the insurer met its obligation by making payment to Sentry in full satisfaction of its claim, the proceeds became Sentry’s property to dispose of as it wished. While Sentry may have had a civil obligation to reimburse its clients for their loss, its failure to meet that obligation cannot be transformed into a liability for criminal larceny because nothing belonging to the clients was converted. As we stated in People v Yannett (49 NY2d 296, 301), "[a] distinction must be drawn between the refusal to pay a valid debt and the crime of larceny by embezzlement.”
It is true that in Yannett we stated that a larceny prosecution might lie against a person who had converted to his own use funds that were given to him in trust for another (49 NY2d, at p 303; cf. People v Valenza, 60 NY2d 363, 368-369). It is also true that our prior decisions indicate that a bailee who receives casualty insurance payments in reimbursement for the loss of bailed property holds those payments in trust for the bailor (see, Waring v Indemnity Fire Ins. Co., 45 NY 606; Stillwell v Staples, 19 NY 401). However, these principles do not provide a basis for the imposition of criminal liability in this case.
First, the People have neither claimed that Sentry held the proceeds of its insurance coverage in trust for the clients whose property was lost nor made an effort to show that the insurance policy under which payment was made was a casualty policy rather than one merely insuring against liability. Even more importantly, the trust that our cases impose on casualty insurance proceeds is one that exists, if at all, by operation of equitable principles and not by express agreement of the parties (see, Stillwell v Staples, supra, at pp 406-407; cf. People v Robinson, 284 NY 75). It is clear that an alleged misuse of funds on which only an equitable or constructive trust has been imposed cannot support a larceny prosecution (People v Yannett, supra, at pp 303-304; see, People v Epstein, 245 NY 234, 242-243). This conclusion follows from the fact that the "beneficiaries” of a constructive trust "sim *128 ply do not have the requisite pre-existing interest, superior to that of the legal owner of those funds, which is necessary to support a larceny conviction” (People v Yannett, supra, at p 304; see, Hechtman, op. cit., Penal Law § 155.00, p 104).
As the named holder of the insurance policy, Sentry was the legal owner of the funds paid to it by the insurer. While its clients may have had a civil claim against Sentry, and even a right in the funds superior to Sentry’s creditors, they did not have a right superior to that of Sentry to possess the proceeds of Sentry’s insurance policy. Moreover, if the insurer had wanted assurance that the funds would be given directly to the companies that had actually sustained loss, it could have simply issued individual checks jointly payable to them and Sentry. In any event, there was no unlawful taking of funds from their rightful owner here, and the indictment charging defendant Jennings with larceny because of his failure to pay all of the insurance proceeds to Sentry’s clients should not have been reinstated.
VII. THE MISSING COINS AND MONEY
The final set of charges, consisting of three counts of second degree larceny asserted against defendants Jennings and Fiumefreddo in indictment No. 640/83, arises out of a series of incidents in which Sentry simply failed to deliver money with which it had been entrusted. In one instance, Sentry allegedly failed to deliver to Chemical Bank’s Water Street offices some $38,000 in coins that it had picked up on January 5, 1983 from a concern called Hercules Coinomatic Company. Instead, it deposited a check, which was Subsequently dishonored, in Hercules’ account at Chemical. In a second instance, Sentry had been given two checks by its client, Freedom National Bank, which checks were supposed to have been used by Sentry to purchase an assortment of coins for delivery to two of Freedom National’s branch offices on January 12, 1983. The checks, written in the amounts of $31,500 and $40,500, were negotiated by Sentry, respectively, on December 31, 1982 and January 7, 1983. The coins, however, were never delivered and Freedom National was never reimbursed for its advance payments. The third charged incident involved Sentry’s alleged mishandling of payroll money belonging to the New York Telephone Company, resulting in a loss to that company of some $133,141 over the period from December 29, 1982 to January 13, 1983.
*129 The People’s theory, broadly stated, is that defendants were guilty of routinely commingling their clients’ money and that, in the aftermath of the warehouse robbery, they found it necessary to convert their clients’ money to meet immediate obligations and cover for the shortages that had accumulated in their clients’ accounts. The foregoing three incidents of unexplained loss, the People claim, exemplify defendants’ larcenous practices. The three counts embodying this theory were dismissed by Justice Goldfluss on his consideration of the Grand Jury evidence, and the Appellate Division affirmed, without comment. We conclude, however, that the counts in indictment No. 640/83 should have been sustained.
Defendants’ primary contention with respect to each of these counts is that they had both been relieved of their authority at Sentry by January 3 or 4, 1983 and therefore could not have been responsible for the losses, all of which had come to light thereafter. There are, however, two difficulties with their position. First, the proof regarding when these defendants were actually relieved of their corporate duties was not conclusive. Second, regardless of their formal status, there was affirmative evidence of defendants’ continued participation in the activities of the corporation, including a paper-shredding episode involving defendant Fiumefreddo and defendant Jennings’ presence at an audit, both occurring after the date when their ties to the company were supposed to have been severed.
Hence, if we view the evidence before the Grand Jury in the light most favorable to the People, as we must (People v Pelchat, supra), we are led to the conclusion that the Grand Jury could have rationally returned indictments charging defendants with larceny in connection with the Hercules Coinomatic, Freedom National Bank and New York Telephone Company shortages. Defendants’ larcenous intent could have been inferred from such surrounding circumstances as the paper-shredding incident and the evidence of an ongoing practice of commingling clients’ funds (see, People v Meadows, 199 NY 1), as well as from the unexplained disappearance of the money itself (see, People v Olivo, 52 NY2d, at p 320, n 8, supra). Accordingly, the dismissal of indictment No. 640/83 against defendants Jennings and Fiumefreddo was error.[13]
*130 VIII. CONCLUSION
To summarize our conclusions, we hold that the Appellate Division correctly affirmed the dismissal of indictments Nos. 4379/83, 4380/83 and 370/84, charging defendants Jennings, Finnerty, Sentry Armored Courier Corp. and Sentry Investigations Corp. with second degree grand larceny and misapplication of property arising out of the "repurchase agreement” plan. We further hold that the misapplication of property count in indictment No. 369/84, involving the "compensatory balance” account, was properly reinstated. Our disagreement with the Appellate Division lies in its disposition of the counts in indictment No. 640/83, involving the various "missing money” incidents, and the larceny count in indictment No. 638/83, involving the alleged misappropriation of insurance proceeds, as well as the larceny count in indictment No. 369/ 84. The counts in the "missing money” indictment, asserted at this point against defendants Jennings and Fiumefreddo alone, should have been reinstated, while the dismissal of the larceny counts asserted in the "compensatory balance” account indictment and the indictment involving the insurance proceeds should have been affirmed.
Accordingly, the order of the Appellate Division should be modified by reversing so much thereof as affirmed the dismissal of indictment No. 640/83 against defendants John Jennings and Angela Fiumefreddo, reversed the dismissal of the larceny count against those defendants in indictment No. 369/84 and reversed the dismissal of the larceny count against Jennings in indictment No. 638/83; indictment No. 640/83 should be reinstated and the matter remitted for further proceedings on that indictment, as well as on the misapplication of property count in indictment No. 369/84.

.The same analysis might not be applicable in a case where a party has moved entirety ex parte before a second Judge after having been denied identical relief by the first.

.True, there is "moral certainty” language in one of our decisions (see, People v Eckert, 2 NY2d 126, 129), but that decision is ambiguous and internally inconsistent. The Eckert language has not been cited by this court in the context of a review of an indictment since that case was decided, although we have cited the case in reviewing convictions after trial (see, e.g., People v Eisenman, 39 NY2d 810, 811; People v Wachowicz, 22 NY2d 369, 372). To the extent that the case contains language inconsistent with our subsequent decisions and the plain terms of the statute governing review of indictments, it is no longer viable and is not to be followed.

.Before Sentry picked up the deposits, Chemical would complete a "bulk count” by verifying the numbers of bundles its customers had deposited. Sentry would then "fine count” the deposits by counting the individual bills within each bundle. The agreement required Sentry to deliver to Chemical’s Federal Reserve Bank account the amount that was necessary to satisfy Chemical’s deposit requirements; the remainder of the cash, if any, was to be returned directly to Chemical.

.It was because larceny was held to include the element of an intent permanently to deprive or appropriate that the Legislature enacted Penal Law § 1293-a (since replaced by Penal Law §§ 165.00, 165.05, 165.06 and 165.08) to bring intentional temporary misuse of another’s property within the purview of the criminal law (see, Hechtman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law § 165.05, p 219; see also, id., § 155.00, pp 103-104).

.Although a person who "borrows” a vehicle without the owner’s consent unquestionably appropriates its entire economic benefit during the time he is using it, our case law does not recognize such conduct as larceny if it was accompanied by an intention to return the vehicle to its true owner *120 (see, Van Vechten v American Eagle Fire Ins. Co., 239 NY 303, 305). Thus, contrary to the dissent’s view (dissenting opn, at p 132), we do not deem defendants’ conduct larcenous because they "acquired all the economic benefit of [Chemical’s money] for the time they held it.” Indeed, if that proposition were true, there would be no distinction between the crime of larceny and the crime of misapplication of property under Penal Law § 165.00.

.Contrary to the dissenters’ conclusion (dissenting opn, at pp 134-135, n 1), our holding in Matter of Surrey Strathmore Corp. v Dollar Sav. Bank (36 NY2d 173, 177) was not based on an interpretation of the particular contract between the parties. Rather, our holding in Surrey was that, in the absence of an "explicit provision * * * with respect to payment of interest”, the law does not provide the party whose money is being held with a right to the interest earned while that money is in another’s possession.

.That the funds were also held in Sentry’s account at Hudson for short periods of time did not increase the risk of loss, since Sentry retained total control over the funds and the funds were in no way encumbered during those periods (compare, infra, at pp 125-126, n 11).

.There was evidence that money was actually due on both sides, with Chemical also owing Sentry for unreimbursed services rendered. It appears from the evidence, however, that a substantial net balance was owed to Chemical by Sentry.

. [10] Although defendant Jennings’ motion addressed to Justice Goldfluss sought dismissal of the "indictments” and recited as one of the grounds for dismissal that the evidence was legally insufficient, the caption of his motion papers cited only three of the four extant indictments, omitting for no apparent reason indictment No. 369/84, which covered the "compensatory balance account” charges. Under the amended version of CPL 470.05 (2), a preserved "question of law” exists "if in response to a protest by a party, the court expressly decided the question raised on appeal.” Here, we have both a "protest” in the form of Jennings’ incomplete motion to dismiss, a dismissal of all counts including the one omitted from the motion ánd an opinion in which the trial court expressly describes its reasons for doing so (123 Misc 2d 560). Accordingly, under the current version of CPL 470.05 (2), the intent issue presents a question of law reviewable in our court.

.There is no indication that defendants intended to "dispose of the property in such a manner or under such circumstances as to render it unlikely that [the] owner will recover [it]” (Penal Law § 155.00 [3] [b]; [4] [b]; § 155.05 [1]). While subsequent events did result in the loss of the money through Citibank’s actions in freezing the account, it cannot be said that such an eventuality was likely or within the contemplation of the parties during the time the "compensatory balance” account was opened and maintained. Hence, the alternative theory of larcenous intent set forth in Penal Law § 155.00 (3) (b) and incorporated by reference in Penal Law § 155.05 (1) is unavailable to the prosecution in this case.

.Indeed, it is Citibank’s status as a creditor of Sentry that differentiates the risk arising from the "compensatory balance” account from the risk arising from the "repurchase agreements” with Hudson Valley. Although, as the dissenters note, Sentry’s accounts with both Citibank and Hudson *126 were "escrow” accounts and not generally reachable by ordinary creditors, the fact that Citibank was both a depository bank and a creditor enhanced the risk that the funds would be seized, however wrongfully, and thereby took that risk out of the realm of sheer speculation. The same cannot be said for the fact, noted in the dissenting opinion (at p 137, n 3), that Hudson had lost money as a result of a theft by a Sentry employee and therefore might have had a cause of action against Sentry.

. The indictment originally charged Jennings and Sentry Armored Courier Corp. with insurance fraud, misapplication of property and conspiracy, as well as grand larceny. None of these counts survived the first dismissal motion made to Justice Vitale.

. Justice Vitale dismissed the indictment against the corporate defendant, Sentry Armored Courier Corp., on the first dismissal motion, and the People did not appeal that determination. Accordingly, our reinstatement of *130 the indictment affects only Jennings and Fiumefreddo, the defendants who remained when the indictment came before Justice Goldfluss.