[664 NYS2d 17]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v RICHARD MOLLOY, Respondent.

First Department, November 13, 1997

## APPEARANCES OF COUNSEL

*Peter D. Coddington* of counsel *(Robert T. Johnson, District Attorney* of Bronx County, attorney), for appellant.

*Fabian G. Palomino* of counsel *(Louis R. Rosenthal* and *George H. Vallario, Jr.,* attorneys), for respondent.

## OPINION OF THE COURT

WALLACH, J.

The Grand Jury returned an indictment charging defendant, a New York City policeman, with "depraved indifference" murder in the second degree (Penal Law § 125.25 [2]) and manslaughter in the second degree (Penal Law § 125.15 [1]). Each crime requires proof of "reckless" conduct. The People appeal from an order dismissing the indictment for lack of proof of the necessary element of recklessness, despite the existence of "inculpatory circumstantial evidence" of such conduct.

Testimony from a number of witnesses provided grand jurors with a detailed picture of the final hours of the victim's life on the night of January 20-21, 1996, and his close interaction with defendant during that terminal period. The Grand Jury heard evidence that defendant's girlfriend, Maggie, worked as a bartender at the Oak Bar on Rochambeau Avenue in the Bronx. The deceased, Patrick Heslin (Hessy) Phelan, was a house painter by trade who frequented the Oak Bar; he would often get drunk there on weekends, and occasionally sleep it off at Maggie's apartment across the street. On the fatal night, the inebriated Hessy got angry and began annoying other customers. When defendant arrived at the Oak Bar shortly after midnight, having consumed a few drinks elsewhere, Maggie was heard asking him to take Hessy over to her apartment. A number of witnesses saw the 5 foot, 9 inches, 142-pound defendant escort the diminutive Hessy (5 feet, 100 pounds) out by the arm, and two customers testified that defendant appeared to get rough with him, twisting his arm up behind his back as he shoved him out the door.

Lee, a tenant of Maggie's who had himself been drinking heavily* at the apartment, testified that he had been cooking potatoes in the kitchen shortly before 1:00 A.M. when he heard Hessy stagger into the apartment, quite drunk, accompanied by defendant. Before Lee retired for the night, he looked into the living room and saw Hessy sitting upright on the couch with defendant standing over him. Through his bedroom wall, Lee could hear the two men conversing, but he could not make out any of the words, except at one point when he heard Hessy shout "go on, go on," in a loud, angry voice, followed immediately by a loud bang. Lee went straight to the living room and saw defendant standing over the couch, removing his hand from the back of his jacket. Hessy was lying on his back in the middle of the couch, with his hands resting on his chest, bleeding from one eye and gasping for breath. When defendant saw Lee, he threw up his hands and said, "Oh, my God, he shot himself." Lee never saw a gun. The police were summoned, but not before defendant instructed Lee to "tell them nothing; you know nothing." When the police arrived, the jacketed defendant handed over his service revolver, containing five live rounds and one spent shell. Defendant told the police that Hessy had "got his gun and shot himself."

The next night, defendant cornered Lee in the bathroom at the Oak Bar and questioned him about what he had told the police, and specifically whether he had mentioned seeing a gun.

Defendant acknowledged to the Grand Jury that his .38 Smith & Wesson revolver, with a 4-inch barrel, was carried in a snug, leather holster which was worn on the right side of his belt, under his jacket. He did not recall if he had removed his jacket in the apartment. The gun was secured in the holster by a leather strap which ran from the outside, over the handle, behind the hammer, and snapped on the "body" side. It was demonstrated to the Grand Jury that the gun could not be pulled from the holster with one hand while the strap was snapped shut. Defendant never saw or felt Hessy removing his gun.

Defendant's testimony was that he had been sitting on the couch with Hessy, who was drifting in and out of a drunken stupor and rambling about how defendant should marry Maggie. He described Hessy as "like a little kid * * * you could

---

* Five or six shots of Jack Daniels, and an equal number of beers, over the course of four hours.

breathe on him and he would fall over." Defendant further testified that at one point he wiped some foam from Hessy's mouth with a paper towel. Later he got up to turn on the television. Seconds later, he turned around to see Hessy holding his gun with two hands—possibly one on the barrel and the other on the trigger—pointed at Hessy's own head. Defendant could not recall whether the hammer was cocked, or even whether the gun was being held rightside up or upside down. "I reached out to get him. I didn't even have time to say anything. He shot himself in the head." Describing himself as "in absolute shock", defendant then picked up the gun (which he might have knocked to the floor in trying to swipe it off the chest of Hessy, who was still alive) and put it on the couch. The next thing he knew, Lee came running in from the next room, "drunk out of his mind". He acknowledged putting the gun into his pocket, where it remained until the police arrived.

Hessy died from a single gunshot through his brain. Dr. Hedda Jindrak, the Medical Examiner, testified that the fatal bullet was fired from a gun "placed firmly in the inner corner of his left eye" and exited the back of the head, just to the right of the midline. The gun was actually "wedged" into this area, causing a "full contact wound."

One other injury was noted during the autopsy—a small (one-fourth inch), squarish contusion in the middle of Hessy's forehead, consistent with contact with the barrel of a revolver. This minor wound was suffered "[w]ithin a few minutes of his death." Dr. Jindrak was of the opinion that the fatal wound was not self-inflicted, noting that "it would be very difficult for a right-handed person [such as Hessy] to produce that angle."

On a motion to dismiss an indictment, the standard for assessing legal sufficiency of evidence before a Grand Jury is that the court must examine such evidence in the light most favorable to the People (*People v Warner-Lambert Co.*, 51 NY2d 295, 299, *cert denied* 450 US 1031). No higher standard is to be applied where the evidence is circumstantial (*People v Jennings*, 69 NY2d 103, 114).

The People and defendant urge two conflicting hypotheses. The People posit that defendant was bullying Hessy with his gun when it discharged. Defendant would have it that a fumbling Hessy had somehow managed to withdraw the gun from the holster without defendant even realizing it, and turned it on himself, in the space of seconds, to inflict the mortal wound. The People's contention would explain the barrel-sized contusion on Hessy's forehead. Defendant's

exculpatory version would require rejection of all of Lee's testimony—that defendant was wearing his jacket (which would have covered his holster), and Hessy's loud screams of "go on, go on," immediately preceding the gun's discharge. Where the truth lies properly presents a choice for a petit jury as to whether reckless or depraved conduct has been established beyond a reasonable doubt; that kind of determination is not to be made by the court on a motion to dismiss an indictment prior to trial (*People v Jennings, supra*).

The last words overheard by Lee ("go on, go on") could be found to have been uttered by a drunken Hessy taunting defendant to pull the trigger. Certainly, defendant's action in pressing the gun so close to Hessy's head would satisfy the requirement for proof of criminally reckless conduct. (*See, People v Tuck*, 87 NY2d 828; *People v Chrysler*, 85 NY2d 413; *People v Vega*, 238 AD2d 278, *lv denied* 90 NY2d 911; *People v Johnson*, 205 AD2d 707, *lv denied* 84 NY2d 868; *People v Santana*, 163 AD2d 495, *affd* 78 NY2d 1027, *overruled on other grounds by People v Agramonte*, 87 NY2d 765; *People v Graham*, 41 AD2d 226; *cf., People v Rose*, 208 AD2d 414, *lv denied* 84 NY2d 1015 [where evidence of an intentional act under similar circumstances overshadowed any possibility of recklessness].) Such evidence is legally sufficient even where it is circumstantial (*People v Santana, supra*).

Accordingly, the order of Supreme Court, Bronx County (Lawrence Tonetti, J.), entered April 21, 1997, which dismissed the indictment, should be reversed, on the law, the indictment reinstated, and the matter remanded for further proceedings.

Milonas, J. P., Williams and Mazzarelli, JJ., concur.

Order, Supreme Court, Bronx County, entered April 21, 1997, reversed, on the law, the indictment reinstated and the matter remanded for further proceedings.