OPINION OF THE COURT
Bernard J. Fried, J.
Defendant, who is charged with refusing to treat a person in need of emergency medical treatment (Public Health Law § 2805-b [2] [b]), falsifying business records in the first degree *49 (Penal Law § 175.10), and tampering with physical evidence (Penal Law § 215.40), seeks dismissal of the Public Health Law charge on various constitutional grounds.
The Grand Jury evidence reveals that on September 22, 1991, a New York City Emergency Medical Services (EMS) ambulance, responding to a radio call, arrived at a police station, where Charlesetta Brown was in labor, experiencing contractions approximately two minutes apart. EMS technicians, William Ludwig and Mary Dandridge, examined her and determined that they had time to go to Harlem Hospital, where she had been receiving prenatal care. At 5:22 a.m., they arrived at the admitting area for patients in labor where Ludwig presented Ms. Brown to the defendant, Dr. Anyakora, a chief resident in the OBS/GYN unit, i.e., telling him her condition, vital signs, medical history, etc. He was interrupted when the doctor asked if he was aware that the hospital was on "diversion”.[1] Ludwig replied that he was not aware of this. Dr. Anyakora said that he was "not going to look at” Ms. Brown and telephoned the hospital administrator and repeated to him what he had just told Ludwig. The administrator asked Dr. Anyakora to examine Ms. Brown, but Dr. Anyakora refused and handed the phone to Ludwig. The administrator spoke to Ludwig for a short time and asked to speak to Dr. Anyakora again. However, Dr. Anyakora had left the room.
Ludwig then called his supervisor, Lieutenant Pamela Fusco, who came to the hospital, and was told by Dr. Anyakora that "he was not serving the patient”, and he left. Meanwhile, Ludwig and his partner tended to Ms. Brown, who was still on an EMS stretcher in the middle of the examination room. At 6:10 a.m., the EMS personnel delivered her baby without the assistance of anyone from Harlem Hospital. One complication was that the amniotic sac had not ruptured prior to delivery. Eventually the sac was broken and the baby was delivered healthy. There was also evidence that Dr. Anyakora subsequently falsified hospital records to make it appear as though his conduct was justified.
Public Health Law § 2805-b was originally enacted in 1969 as Public Health Law § 2805-a (L 1969, ch 762, § 2) to insure *50 that general hospitals[2] not deny admission to any person in need of immediate hospitalization based on their inability to pay. This provision alone did not require that persons seeking emergency treatment at general hospitals be treated since, technically speaking, emergency patients are not immediately admitted to the hospital. Thus, hospitals still had the option of accepting or rejecting persons in need of emergency care. However, to insure that persons seeking and in need of such care would receive it (at least at general hospitals in cities with populations of one million or more, i.e., New York City), the statute was amended in 1973 to require general hospitals to treat all such persons (L 1973, ch 712, § 1). It was amended again in 1976 to require every general hospital which maintains facilities for providing out-patient emergency medical care to provide such care to any person who, in the opinion of a physician, requires it (L 1976, ch 928, § 2).
The statute was further amended by the Emergency Medical Services Act of 1983 (the Act), which added the current provisions that impose criminal sanctions on any general hospital which fails to treat all persons arriving at the entrance to such hospital seeking and in need of emergency medical care, and on a licensed medical practitioner who refuses to treat any such person (L 1983, ch 787, § 2).[3] The Act was drafted to prevent instances of unnecessary deaths or disabilities (Budget Report on Bills [July 20, 1983], Bill Jacket, L 1983, ch 787) by correcting flagrant abuses in the EMS system in New York City (Assemblyman Hevesi in support of L 1983, ch 787, Bill Jacket). "Quite simply,” wrote Hevesi, the bill’s sponsor, "this legislation is aimed at saving lives.”
Defendant contends that paragraph (b) of Public Health Law § 2805-b (2) does not impose strict liability on licensed medical practitioners, or, in other words, that in order to violate the statute a licensed medical practitioner must know that the person who is being refused emergency medical *51 treatment is actually in need of such treatment. He claims that the Legislature evinced its intention not to impose strict liability in paragraph (b) by using the phrase "refuses to treat” instead of "fails to treat” as in paragraph (a). He also claims that if this asserted mens rea is "written out of the statute” it "would make every medical professional in a hospital potentially guilty of violating the statute even if he or she were on a different floor and unaware of the patient.”
While strict liability offenses are generally disfavored, the legislative power to impose liability without fault is often found valid in the areas of public health, safety and welfare. Put another way, the public policy of achieving social betterment through the exercise of the police power " 'may require that in the prohibition or punishment of particular acts it may be provided that he who shall do them shall do them at his peril and will not be heard to plead in defense good faith or ignorance” (People v Dozier, 72 AD2d 478, 485 [1st Dept 1980], quoting Shevlin-Carpenter Co. v Minnesota, 218 US 57, 70 [1910]). Such offenses are governed by sections 15.10 and 15.15 (2) of the Penal Law.[4]
Analyzing paragraph (b) against these Penal Law sections, it is a clear attempt by the Legislature to impose strict liability on licensed medical practitioners with respect to the element of whether the person seeking emergency treatment was actually in need of such treatment. The statute provides no explicit mens rea and the proscribed conduct, refusing to treat a person in need of emergency medical treatment, does not necessarily involve the culpable mental state of knowing that the person who is being refused emergency medical treatment is in actual need of such treatment.
It is instructive that the Court of Appeals, in analyzing *52 whether an unrelated section of the Public Health Law imposes strict liability, pointed to paragraph (a) as a provision of the Public Health Law in which the Legislature has "clearly” demonstrated an intention to impose "strict criminal liability” (People v Coe, 71 NY2d 852, 855 [1988]). While paragraph (a) imposes strict liability on general hospitals, the Legislature’s use of parallel language in paragraph (b) reveals that it intended to impose such liability on licensed medical practitioners as well.
The use of "refuses” instead of "fails” in paragraph (b) evinces the Legislature’s intention to partially limit Public Health Law § 2805-b (2)’s scope of liability with respect to individuals while effectively maintaining strict liability. " 'Fail’ is distinguished from 'refuse’ in that 'refuse’ involves an act of the will” (Black’s Law Dictionary 1282 [6th ed 1990]). "Fail” means involuntarily to fall short of success” (id., at 594 [emphasis added]). " '[R]efusal’ implies the positive denial of an application or command, or at least a mental determination not to comply” (id., at 1282 [emphasis added]). Thus, a general hospital may be liable under paragraph (a) for "failing to treat” a person even though its agents were not aware that such person sought but did not receive emergency medical treatment. On the other hand, to be liable for "refusing to treat” under paragraph (b), a licensed medical practitioner must at least be cognizant of the particular person to whom treatment is denied.
This construction of Public Health Law § 2805-b (2) comports with the strict liability provisions of the Penal Law, since "refusal” "necessarily involves [the] culpable mental state” (Penal Law § 15.15 [2]) of awareness. Accordingly, with this interpretation, paragraph (b) meets the Penal Law’s minimum requirements for imposing criminal liability on individuals because it requires "the performance by a person of conduct which includes a voluntary act or the omission to perform an act which he is physically capable of performing” (Penal Law § 15.10). Such a reading of paragraph (b) also avoids many seemingly unfair applications of the statute, including the one posited by defendant, because a licensed medical practitioner cannot be guilty merely because a person seeking and in need of emergency medical treatment did not receive such treatment. There must also be a voluntary "refusal” to treat the person.
Finally, it has been held that in enacting Public Health Law § 2805-b the Legislature decided that "the need to protect *53 the public and insure proper and prompt treatment in emergency situations was obviously thought to outweigh the need for blameworthiness as a basis for criminal liability” (People v Flushing Hosp. & Med. Ctr., 122 Misc 2d 260, 264 [1983] ["bad intent” not required to hold general hospital liable for wilful violation under Public Health Law § 2805-b (2)]). Likewise, I conclude that subdivision (2) (b) imposes strict liability on licensed medical practitioners to the extent that they may be culpable without having actual knowledge that the person they refused to treat was in need of emergency medical treatment at the time they refused to treat them. (See, People v Ford, NYLJ, Apr. 10, 1989, at 28, col 4 [Kron, J., Crim Ct, Queens County].) In so concluding, I have not written a mens rea element out of the statute, but rather refused to write one in.
Defendant also contends that paragraph (b) is unconstitutionally vague. It is fundamental that there is a strong presumption that a statute duly enacted by the Legislature is constitutional (People v Pagnotta, 25 NY2d 333, 337 [1969]). A statute will only be struck down as a last resort (Defiance Milk Prods. Co. v Du Mond, 309 NY 537, 540-541 [1956]) and only when it is shown to be unconstitutional beyond a reasonable doubt (Matter of Van Berkel v Power, 16 NY2d 37, 40 [1965]). No such showing has been made here.
Defendant’s claim is that, since the statute uses the terms "treat” and "emergency medical treatment” but does not define them or "enunciate criteria as to how and by whom such concepts are to be developed” it does not give sufficient notice to licensed medical practitioners of the conduct it proscribes. He argues that, left undefined, these terms do not provide sufficient guidance because licensed medical practitioners do not always agree on a proper course of treatment or what constitutes an "emergency.” He further contends that the statute is invalid because its mandate to "treat” implicitly requires licensed medical practitioners to examine and diagnose people seeking emergency medical treatment. Furthermore with regard to vagueness, defendant claims that paragraph (b) punishes otherwise innocent conduct and thus, in the language of People v Munoz (9 NY2d 51, 56 [1961]), "it is necessary that the elements of the offense be spelled out in words even more explicitly.”
Due process requires that a statute "be sufficiently definite to give a reasonable man subject to it notice of the nature of what is prohibited and what is required of him” (People v *54 Pagnotta, supra, at 337). A statute may include ordinary terms (People v Byron, 17 NY2d 64, 67 [1966]) and its language must be measured by common understanding and practices (People v Illardo, 48 NY2d 408, 414 [1979]). While "there may be imaginable instances in which some difficulty in determining on which side of the line a particular fact situation falls, this alone does not render the statute’s language impermissibly vague” (supra, at 415).
Clearly due process does not require that a statute define or provide a means to define all its terms. "Treat” and "emergency” give sufficient notice because each is a term of general import and has a definite and ascertainable meaning intelligible to the average licensed medical practitioner without definition by the Legislature. To "treat” means "to deal with” (Random House Dictionary of English Language 2015 [2d ed Unabridged 1987]). When viewed in the context of Public Health Law § 2805-b, this term has a natural and obvious meaning. It is the generic term commonly used and understood to convey what medical practitioners do in rendering their services to patients. Moreover, the term is familiar to the law of medicine. Indeed, it is used in the statutory definition of the practice of medicine.[5]
The supposition that not all licensed medical practitioners would agree on what course of treatment to follow in certain situations has no constitutional import. The statute does not proscribe or prescribe any particular type of treatment. The question the statute raises is whether or not a licensed medical practitioner refused to treat a person. Therefore, determining the course of treatment that other licensed medical practitioners would have followed under the same circumstances would not be relevant.
Moreover, the statute is reasonably read to require licensed medical practitioners to examine and diagnose persons seeking treatment. This is consistent with Palmieri v Cuomo (170 AD2d 283 [1st Dept 1991]), where it was held that Public Health Law § 2805-b (2) (a) does not require drug treatment on demand at hospital emergency rooms. With reference to paragraph (a)’s mandate to "treat,” the Court stated that the plaintiffs fell short of sufficiently alleging a violation of the *55 statute because they "made no claims that they were not examined or diagnosed when they presented themselves at the emergency rooms” (supra, at 284 [emphasis added]). Likewise, a violation of paragraph (b) would result from the refusal of a licensed medical practitioner to examine or diagnose a person seeking and in need of emergency medical care. If this were not the case, a licensed medical practitioner who refused to even look at a person seeking emergency medical treatment would not be responsible under paragraph (b) and the express purpose of the statute — to ensure that those in need of such treatment, receive it — would be frustrated.
Nor is paragraph (b) unconstitutionally vague because it uses the term "emergency medical treatment” and thus requires a licensed medical practitioner to understand whether a situation constitutes a medical "emergency.” Unquestionably, the term is commonly used and understood by licensed medical practitioners, and like "treat”, it is used in other statutes that regulate medical practice, e.g., the "good Samaritan” statute[6] and Public Health Law § 3001 (l).[7] While it may be true that licensed medical practitioners sometimes differ on whether certain cases present "emergency” situations, when, as here, "the general class of offenses to which the statute is directed is plainly within its terms, the statute will not be struck down as vague, even though marginal cases could be put where doubts may arise” (United States v Harriss, 347 US 612, 618 [1954]). Indeed, whether a particular person was in need of "emergency medical treatment” is a question of fact for trial.
Furthermore, paragraph (b) does not punish innocent conduct. Thus, People v Munoz (supra), to the extent cited by defendant, is inapposite. In Munoz, the Court held a law prohibiting the carrying of a pen knife to be unconstitutional. In so doing it explained the distinction between malum prohibitum and malum in se offenses. It determined that a law prohibiting the carrying of a pen knife was malum prohibitum because it had no mens rea element, or requirement that there *56 be proof that the knife was possessed with a criminal intent, and, apart from the law, there was no moral guilt in engaging in the prohibited act. This determination was elemental in the Court’s determination that the law was unconstitutional.
In contrast, the act prohibited by paragraph (b) is not innocent or blameless. As the bill’s drafter stated: "Refusing treatment is professional misconduct * * * which can result in the loss of a doctor’s or nurse’s license” (Newsday, Dec. 29, 1982, at 4, quoting Assemblyman Hevesi’s Mem in support of L 1983, ch 787, Bill Jacket). Furthermore, principles of medical ethics dictate that a " 'physician shall, in the provision of appropriate patient care, except in emergencies, be free to choose whom to serve’ ” (Note, Preventing Patient Dumping: Sharpening the Cobra’s Fangs, 61 NYU L Rev 1186, 1189, n 21 [1986], quoting Council on Ethical and Judicial Affairs of the American Medical Association, Current Opinions ix [1986] [emphasis added]). Thus, while paragraph (b) clearly imposes strict liability, the conduct it proscribes may be accurately characterized as malum in se with regard to medical professionals since, unlike in Munoz, guilt does not consist "entirely in violation of a legislative fiat” (People v Munoz, 9 NY2d 51, 56, supra), but rather a legislative determination to criminalize professionally improper conduct.
Relevant here though is the Munoz Court’s discussion concerning when the Legislature may validly exercise its police power. The Court pointed to the need for there to be "some reasonable relationship between the public safety, health, morals or welfare and the act prohibited” (People v Munoz, supra, at 58). Clearly, Public Health Law § 2805-b (2) (b) meets this test. There is obviously a reasonable relationship between preventing unnecessary deaths or disabilities among persons seeking and in need of emergency medical treatment and prohibiting those directly responsible for rendering such care from refusing to treat them.
Defendant contends that "the problem of constitutional overbreadth is also manifest.” Here he claims that paragraph (b) is unconstitutional because its "unequivocal language” applies to conduct that the Legislature never intended to reach; he deduces from the legislative history that the Legislature meant for the statute only to apply to private hospitals, and further, only to designated "emergency rooms.”
First, an "overbreadth” claim normally concerns constitutionally protected speech. "The 'overbreadth’ doctrine * * * *57 permits a defendant to make a facial challenge to an overly broad statute restricting speech, even if he himself has engaged in speech that could be regulated under a more narrowly drawn statute” and thus cannot be used to invalidate a statute that does not criminalize constitutionally protected speech (Alexander v United States, 509 US —, —, 113 S Ct 2766, 2774 [1993]). Here, defendant asserts no such free speech claim, but instead argues that the statute is irrational. To support this contention he relies on People v Jennings (69 NY2d 103 [1986]), which held that the larceny statute must be read to apply only to a taking of property itself, not to a permanent taking of the economic value of its use during the time the property was withheld, because the latter application of the statute " 'extended beyond the fair scope of the statutory mandate’ ” and was "inconsistent with the statutory design” (supra, at 121). This reliance on Jennings is puzzling since the Court merely decided whether the particular application of the statute was mandated by its language — not whether to strike down the statute for any defect, constitutional or otherwise — and, furthermore, did not discuss the statute’s legislative history. In any event, both the language and legislative history of paragraph (b) reveal that applying it to the conduct alleged here is neither "inconsistent with the statutory design” nor extending it "beyond the fair scope of the statutory mandate.”
The fact is that the language regarding the breadth of paragraph (b)’s coverage could not be clearer. The pertinent portion reads as follows: "Any licensed medical practitioner who refuses to treat a person arriving at a general hospital to receive emergency medical treatment.” (Public Health Law § 2805-b [2] [b].) A plain reading of the statute reveals that it applies to general hospitals, both private and public, and has no limitation based on where, at such hospital, a person arrives to seek treatment, whether it be at a designated "emergency room” or not. Had the Legislature sought to apply paragraph (b) only to private hospital "emergency rooms” it could easily have done so. It did not. The legislative history reveals that the Legislature was aware of such distinctions. The statute clearly reveals that it refused to draw them.
Finally, construed in this manner, the proscriptions of paragraph (b) are rationally related to its purpose. There is an obvious and logical relationship between preventing unnecessary deaths or disabilities among persons seeking and in need of emergency medical treatment and prohibiting licensed *58 medical practitioners at public and private general hospitals from refusing to treat them, whether or not such persons arrive at designated "emergency” rooms.
Because I am satisfied that Public Health Law § 2805-b (2) (b) is not unconstitutional, this motion is denied.
[Portions of opinion omitted for purposes of publication.]

. Defined in Public Health Law § 2805-b (3), "diversion” is a request by a hospital, necessitated by a bed shortage, to have ambulance services deliver patients to other hospitals. Such a diversion request, however, does not have to be honored by EMS personnel (1989 NY Dept of Health Mem 40 [May 3, 1989]).

. "General hospital” is defined in Public Health Law § 2801 (10). It is not disputed that Harlem Hospital is such a hospital.

. Public Health Law § 2805-b (2) provides as follows: "In cities with a population of one million or more, (a) a general hospital shall provide emergency medical care and treatment to all persons in need of such care and treatment who arrive at the entrance to such hospital therefor. Any general hospital which fails to provide such treatment shall be guilty of a misdemeanor * * * (b) Any licensed medical practitioner who refuses to treat a person arriving at a general hospital to receive emergency medical treatment who is in need of such treatment * * * shall be guilty of a misdemeanor[.]”

. "The minimal requirement for criminal liability is the performance by a person of conduct which includes a voluntary act or the omission to perform an act which he is physically capable of performing. If such conduct is all that is required for commission of a particular offense, or if an offense or some material element thereof does not require a culpable mental state on the part of the actor, such offense is one of strict liability”. (Penal Law § 15.10.) "Although no culpable mental state is expressly designated in a statute defining an offense, a culpable mental state may nevertheless be required for the commission of such offense, or with respect to some or all of the material elements thereof, if the proscribed conduct necessarily involves such culpable mental state. A statute defining a crime, unless clearly indicating a legislative attempt to impose strict liability, should be construed as defining a crime of mental culpability. This paragraph applies to offenses defined both in and outside this chapter.” (Penal Law § 15.15 [2].)

. Education Law §6521 provides: "The practice of the profession of medicine is defined as diagnosing, treating, operating or prescribing for any human disease, pain, injury, deformity or physical condition” (emphasis added).

. Education Law § 6527 (2) reads in part: "any licensed physician who voluntarily and without the expectation of monetary compensation renders first aid or emergency treatment at the scene of an accident or other emergency” (emphasis added).

. Public Health Law § 3001 (1) defines "emergency medical service” as a service engaged in providing "initial emergency medical assistance including, but not limited to, the treatment of trauma, burns, respiratory, circulatory and obstetrical emergencies” (emphasis added).